Slip Op. 02 - 83

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  GREGORY W. CARMAN, CHIEF JUDGE

|  |  |
|---|---|
| PACIFIC GIANT, INC., <u>et al.</u>,<br><br>             Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>            Defendant,<br><br>    and<br><br>CRAWFISH PROCESSORS ALLIANCE, <u>et al.</u>,<br><br>            Defendant-<br>            Intervenors. | Court No. 01-00340 |

[Upon consideration of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record, Defendant's response, and Plaintiffs' reply, Plaintiffs' motion is denied.  The Department of Commerce's determination in *Freshwater Crawfish Tail Meat From the People's Republic of China:  Notice of Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*,  *and Final Partial Rescission of Antidumping Duty Administrative Review*, 66 Fed. Reg. 20,634 (Apr. 24, 2001), *amended by Freshwater Crawfish Tail Meat From the People's Republic of China: Amended Final Results of Administrative Review and New Shipper Reviews*, 66 Fed. Reg. 30,409 (June 6, 2001), is affirmed in part and remanded in part.  Plaintiffs' motion for a hearing is denied.]

*Garvey, Schubert & Barer* (*John C. Kalitka, William E. Perry*), Washington, D.C., for Plaintiffs.

*Robert D. McCallum, Jr*., Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Mark L. Josephs*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Arthur D. Sidney*, Attorney, Office of the Chief Counsel for Import Administration, of

Counsel, for Defendant.

*Adduci, Mastriani & Schaumberg, L.L.P.* (*Will E. Leonard, Mark Leventhal*, *John C. Steinberger*), Washington, D.C., for Defendant-Intervenors.

Dated: August 6, 2002

**OPINION**

**CARMAN, Chief Judge:** This matter comes before the Court on a motion for judgment on the administrative record filed by Pacific Giant, Inc., Worldwide Link, Inc., and Ocean Duke Corp. ("Plaintiffs"). Plaintiffs challenge the Department of Commerce's ("Department" or "Commerce") determination in *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review and New Shipper Reviews, and Final Partial Rescission of Antidumping Duty Administrative Review*, 66 Fed. Reg. 20,634 (Apr. 24, 2001), *amended by* 66 Fed. Reg. 30,409 (June 6, 2001) (*Final Results*). Specifically, Plaintiffs contest: (1) Commerce's application of adverse inferences in choosing from facts available for factors of production of respondent Huaiyin Foreign Trade Corporation No. 30 ("HFTC30"); (2) Commerce's application of surrogate values to well water consumed in the production of crawfish tail meat; and (3) the effects of the Continued Dumping and Subsidy Act of 2000, 19 U.S.C. § 1675c (2000) ("Byrd Amendment"), upon Plaintiffs' due process rights. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c) (2000).

**BACKGROUND**

**I. Procedure**

On August 1, 1997, the Department published an antidumping duty order on freshwater crawfish tail meat from the People's Republic of China ("PRC"). *See Notice of Final Determination of Sales at Less Than Fair Value:  Freshwater Crawfish Tail Meat From the*

*People's Republic of China*, 62 Fed. Reg. 41,347 (Aug. 1, 1997), *amended by Notice of Amendment to Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Freshwater Crawfish Tail Meat From the People's Republic of China*, 62 Fed. Reg. 48,218 (Sept. 15, 1997) ("*Antidumping Duty Order*"). On September 30, 1999, the Department received requests for an administrative review from, among others, respondent HFTC30. The Department then conducted an administrative review of the antidumping duty order for the period September 1, 1998 through August 31, 1999 and published the preliminary results of review on October 11, 2000. *See Notice of Preliminary Results of Antidumping Duty Administrative Review and New Shipper Reviews, Partial Rescission of the Antidumping Duty Administrative Review, and Rescission of a New Shipper Review: Freshwater Crawfish Tail Meat From the People's Republic of China*, 65 Fed. Reg. 60,399 (Oct. 11, 2000) (*Preliminary Results*). Interested parties submitted comments and rebuttal comments and participated in a public hearing on December 11, 2000. Commerce published the *Final Results* on April 24, 2001, and Plaintiffs thereafter timely filed a summons and complaint challenging the final results.

## II. Facts

For respondent HFTC30, Commerce determined a weighted-average dumping margin of 139.68 percent. *See Final Results*, 66 Fed. Reg. at 20,635. To determine the dumping margin, Commerce compared HFTC30's export prices to the normal value of the subject merchandise. *See Preliminary Results*, 65 Fed. Reg. at 60,404.

**a.** **Factors of Production Methodology**

For companies located in the PRC, a nonmarket-economy country, Commerce determines normal value by using a factors of production methodology pursuant to 19 U.S.C. § 1677b(c)(2000). *See id.* Under that methodology, Commerce determines "the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1). To value the factors of production, Commerce uses information regarding their values in a comparable market-economy country. *Id.* The statutory factors of production include, but are not limited to, "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3). Commerce treated respondents' water usage as a factor of production. *See Memorandum from Joseph A. Spetrini to Bernard T. Carreau, Issues and Decision Memo for the Final Results of the Antidumping Duty Administrative Review and the Antidumping New Shipper Reviews of Freshwater Crawfish Tail Meat from the People's Republic of China*, Apr. 9, 2001, Pub. Doc. 297, Pl. Pub. App. Tab 4, at 22 ("*Decision Memo*").[1] To value all factors of production except for the crawfish input, Commerce used publicly available information from India. *See Preliminary Results*, 65 Fed. Reg. at 60,404. For crawfish input, Commerce used Spanish import

---

[1]The *Issues and Decision Memo for the Final Results of the Antidumping Duty Administrative Review and the Antidumping New Shipper Reviews of Freshwater Crawfish Tail Meat from the People's Republic of China* ("*Decision Memo*") is included as part of *Freshwater Crawfish Tail Meat From the People's Republic of China; Notice of Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, *and Final Partial Rescission of Antidumping Duty Administrative Review*, 66 Fed. Reg. 20,634 (Apr. 24, 2001), *amended by* 66 Fed. Reg. 30,409 (June 6, 2001). All page numbers for the *Decision Memo* are cited as paginated in Plaintiffs' Public Appendix Tab 4.

statistics for crawfish imported from Portugal.  *Id*.

**b.      *HFTC30's Two Channels of Sales***

Based upon information obtained at verification, the Department determined that respondent HFTC30 had two channels of sales.  *Decision Memo* at 30.  In the first channel (also referred to as the direct sales channel), HFTC30 acted as a principal, purchasing tail meat and selling it to its U.S. customer.  *See Memorandum From Thomas Gilgunn through Barbara E. Tillman for Joseph A. Spetrini: Determination of Partial Facts Available for Huaiyin Foreign Trade Corporation (30) in the Administrative Review of Freshwater Crawfish Tail Meat from the People's Republic of China* (Sept. 29, 2000), Pub. Doc. 215, Pls.' Pub. App. Tab 3, at 1.  In the second channel, HFTC30 assisted certain U.S. importers in purchasing crawfish tail meat from PRC processors.  *Decision Memo* at 30.

The Department chose to verify one supplier from each sales channel. *Id*.  From the first sales channel, Commerce verified supplier Huaiyin County Freezing Factory ("Huaiyin Freezing").  *See id.* at 36; *see also Memorandum to The File*, *AD Review of Freshwater Crawfish Tail meat from the People's Republic of China (PRC) (A-570-848): Factors Verification Report for Huaiyin County Freezing Factory (Huaiyin Freezing)* (Sept. 29, 2000), Prop. Doc. 65, Pl. Conf. App. Tab 8, at 1 ("*Huaiyin Freezing Verification Memo*").  From the second sales channel, Commerce verified supplier Baoying Freezing Factory ("Baoying Freezing").  *See Memorandum From Thomas Gilgunn through Barbara E. Tillman for Joseph A. Spetrini: Determination of Partial Facts Available for Huaiyin Foreign Trade Corporation (30) in the Administrative Review of Freshwater Crawfish Tail Meat from the People's Republic of China* (Sept. 29, 2000), Prop. Doc. 67, Pls.' Conf. App. Tab 3, at 2 ("*Partial Facts Available Memo*").

### (i)      HFTC30 First Sales Channel

In conducting verification of the first sales channel, Commerce considered HFTC30's questionnaire responses regarding the supplier Huaiyin Freezing. *Huaiyin Freezing Verification Memo,* Pls.' Conf. App. Tab 8, at 1.  Huaiyin Freezing could not demonstrate how it calculated its labor factors of production. *Id*. at 7.  Because the labor factors of production were not verifiable, Commerce found the use of facts otherwise available to be warranted pursuant to 19 U.S.C. § 1677e(a).  *Decision Memo* at 36.  The Department assumed the labor factors for HFTC30's other processors also contained inaccuracies and therefore applied the adverse inference provision of 19 U.S.C. § 1677e(b), which states:

> If the administering authority . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority . . . , the administering authority . . . , in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.

*Decision Memo* at 36.  Commerce made an adverse inference and used partial facts available for the labor factors of all HFTC30's direct sales processors.  *Id*.

### (ii)      HFTC30 Second Sales Channel

In conducting verification of the second sales channel, Commerce considered HFTC30's questionnaire responses regarding Baoying Freezing, a supplier of crawfish tailmeat for HFTC30's second channel sales.  *See Partial Facts Available Memo*, Pls.' Conf. App. Tab 3, at 2.

At verification, the Department could not verify any of the factors of production information that HFTC30 reported for Baoying Freezing. *Decision Memo* at 32.  In addition,

Commerce discovered that HFTC30 had not reported another supplier of crawfish tailmeat named Huishan County Lake Products Processing Factory ("Huishan Lake").  *See Memorandum to The File from Thomas Gilgunn and Lesley Stagliano*, *Antidumping Duty Administrative Review of Freshwater Crawfish Tail meat from the People's Republic of China (PRC) (A-570-848):  Sales Verification Report for Huaiyin Foreign Trade Corporation (30) (Huaiyin30)* (Sept. 29, 2000), Prop. Doc. 57, Pl. Pub. App. Tab 1, at 11.  Commerce therefore determined HFTC30 had failed to cooperate to the best of its ability and that, pursuant to 19 U.S.C. § 1677e(b),  the Department could draw inferences adverse to the interests of HFTC30 in selecting from among the facts otherwise available.  *Decision Memo* at 33.  Commerce accordingly applied a 201.63 percent rate to HFTC30's second channel sales.  *Id*. at 35.

## STANDARD OF REVIEW

This Court will uphold the Department's determination in an administrative review of an antidumping order unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.       **The Department's application of facts otherwise available and adverse inferences to HFTC30's second channel sales is supported by substantial evidence on the record or otherwise in accordance with law.**

   *a.       Parties' Contentions*

Plaintiffs first contend Commerce's application of facts otherwise available and adverse inferences to HFTC30's second channel sales to the U.S. importer Worldwide Link is not supported by substantial evidence on the record or otherwise in accordance with law.  (Pls.'

R56.2 Mot. at 13.)  Plaintiffs argue that HFTC30, Baoying Freezing, and Worldwide Link acted

to the best of their ability in supplying factors of production information to the Department.

They assert that mere mistakes in Baoying Freezing's calculations should not result in an adverse

inference because verified data from Baoying Freezing exists on the record of the investigation,

and the other unverified processors fully cooperated with the Department.  Plaintiffs claim the

Department has not provided a reasoned analysis for determining respondents did not act to the

best of their ability, thereby failing to meet the high standards for applying adverse inferences as

set forth in the Uruguay Round Agreements Act, the WTO Antidumping Agreement, and court

precedent.

Defendant counters that HFTC30 cannot avoid the application of adverse inferences by

pointing to the questionnaire responses of processors other than Baoying Freezing.  According to

Defendant, Baoying Freezing chose to report inaccurately its factors of production; the errors

were numerous, each benefitted the respondent, and neither HFTC30 nor Baoying Freezing could

explain the calculations.  Therefore, Defendant argues Baoying Freezing's errors were not

"simple mistakes," and Commerce properly found HFTC30 had failed to cooperate to the best of

its ability.

Plaintiffs argue Commerce should not have applied facts otherwise available and adverse

inferences to HFTC30's second channel sales to the U.S. importer Pacific Giant, despite

HFTC30's failure to provide the factors of production for Huishan Lake, one of two suppliers for

HFTC30's sales to Pacific Giant.  (Pls.' R56.2 Mot. at 22-24.)  Plaintiffs assert the Department

could have used the factors of production on the record for another of HFTC30's second channel

sales suppliers, Laoshan Brother Freezing Plant, or it could have used the average factors of

production for the crawfish processors that supplied HFTC30 for its direct sales. Plaintiffs state that these alternatives would better reflect the actual dumping margin on HFTC30's sales of crawfish tail meat to Pacific Giant than the "punitive" 201.63 percent dumping margin the Department chose to apply. (*Id*. at 25.)

Defendant counters that Plaintiffs' arguments have no merit because HFTC30 simply failed to provide any information for one of two suppliers to Pacific Giant or to provide a reasonable excuse for its failure to provide the information. Defendant also asserts that information from the Laoshan Brother Freezing Plant is irrelevant because (1) respondents cannot pick and choose which supplier information they will provide; and (2) the information from Laoshan Brother Freezing Plant is not necessarily representative of Huishan Lake.

Finally, Plaintiffs argue the Department should have considered HFTC30's small size–only four employees–in determining whether HFTC30 acted to the best of its ability. Plaintiffs state that pursuant to *Krupp Thyssen Nirosta Gmbh v. United States*, No. 99-08-00550, 2000 WL 1118114 (Ct. Int'l Trade July 31, 2000) ("*Krupp Thyssen*"), Commerce must determine whether HFTC30 had the necessary resources to perform checks on the financial data of the fourteen processors that provided factors to HFTC30.

Defendant, on the other hand, asserts Commerce need not have taken into account the small size of HFTC30 because its numerous errors indicated a pattern of consistent behavior. In addition, Defendant argues HFTC30 failed to inform Commerce of any difficulties that its limited resources would cause it in responding.

### b.      *Analysis*

For ease of discussion, this Court addresses Commerce's rationale employed as to HFTC30's second channel sales preliminary to addressing Commerce's treatment of HFTC30's first channel sales.

Commerce's decision to apply an adverse inference in selecting from among facts otherwise available for HFTC30's second channel sales is supported by substantial evidence on the record or otherwise in accordance with law.  In order to apply adverse inferences, Commerce must find that a respondent "failed to cooperate by not acting to the best of its ability."  19 U.S.C. § 1677e(b).  Such a finding is supported by substantial evidence if Commerce (1) articulates its reasons for concluding a party failed to act to the best of its ability; and (2) explains why the missing information is significant to the review.  *Nippon Steel Corp. v. United States*, 118 F. Supp. 2d 1366, 1378 (Ct. Int'l Trade 2000) ("*Nippon*").

Commerce's reasons for concluding a party failed to act to the best of its ability should include (1) a finding that a party could comply with the request for information; and (2) a finding of either a willful decision not to comply or insufficient attention to statutory duties under the unfair trade laws.  *Id*. at 1378-79.  Commerce found that HFTC30 could have complied with Commerce's requests for information when it stated:  "Considering that [HFTC30's] main business is selling crawfish tail meat and the limited number of suppliers from which it purchased crawfish tail meat, providing the names and quantity purchased from all its suppliers should have been accomplished with relative ease." *Decision Memo* at 33.  Plaintiffs have failed to persuade this Court that HFTC30's small size disabled it from complying with Commerce's requests for information.  Commerce stated that

at no time during the questionnaire response period did [HFTC30] or its suppliers inform the Department that they were unable to accurately answer particular portions of the questionnaire due to their limited resources.  The Department granted [HFTC30] additional time to provide their supplier information after the questionnaire due date.  In addition, we allowed [HFTC30] to significantly revise its supplier information prior to verification.

*Decision Memo* at 34.  Plaintiffs argue that *Krupp Thyssen* requires Commerce to determine whether HFTC30 had the necessary resources to perform checks on the financial data of the fourteen processors that provided factors to HFTC30.  This Court, however, finds *Krupp Thyssen* inapposite, for the record indicates HFTC30's errors and omissions were more than simple mistakes attributable to a lack of resources.  *See Decision Memo* at 33.

In addition to finding that HFTC30 could comply with Commerce's requests for information, Commerce found that HFTC30 had given insufficient attention to its statutory duties.  First, HFTC30 failed to provide the names of all suppliers.  *Decision Memo* at 32.  Second, neither HFTC30 nor Baoying could "demonstrate how they calculated *any* of the ten factors of production which they reported to the Department."  *Id*. (emphasis added).  Such findings demonstrate a reckless disregard of compliance standards that warrants adverse treatment.

Commerce also explained why the missing information is significant to the review, thus satisfying the second prong of the *Nippon* test, when it stated that "[s]uch basic information" as a supplier's name and quantity supplied "is fundamental to the antidumping duty margin calculation process and is readily available only to respondents."  *Decision Memo* at 33.  The Department also explained that "each error in [Baoying Freezing and HFTC30's] response favored the respondents and the net effect of these errors would have significantly reduced

[HFTC30's] margin on the relevant sales." *Id.* Upon consideration of Commerce's reasoned analysis, this Court finds Commerce's decision to apply an adverse inference in selecting from among facts otherwise available for HFTC30's second channel sales be supported by substantial evidence on the record or otherwise in accordance with law.

Furthermore, Commerce properly exercised its discretion in verifying only HFTC30's questionnaire responses for Baoyang Freezing. Although other processors may have cooperated fully with the Department, Commerce has discretion to determine the method by which it will conduct a verification. *See NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1296 (Ct. Int'l Trade 2002) (quoting *Pohang Iron and Steel Co. v. United States*, No. 98-04-00906, 1999 WL 970743, at *16 (Ct. Int'l Trade Oct. 20, 1999)) ("Commerce enjoys 'wide latitude' in its verification procedures."); *see also Carlisle Tire and Rubber Co. v. United States*, 622 F. Supp. 1071, 1082 (Ct. Int'l Trade 1985). An exhaustive examination of the respondent's business is not required. *See PMC Specialties Group, Inc. v. United States*, 20 CIT 1130, 1134 (1996) (quoting *Monsanto Co. v. United States*, 698 F. Supp. 275, 281 (Ct. Int'l Trade 1988)). Commerce conducted a spot check of HFTC30 by examining HFTC30's questionnaire responses for Baoying Freezing. Commerce is not required to examine or use HFTC30's responses for the other suppliers simply because HFTC30 failed to respond accurately for Baoying Freezing or to report any information for Huishan Lake.

II.     **The Department's application of a partial adverse inference in selecting from among facts otherwise available for the labor factors of production for HFTC30's first channel sales suppliers is not supported by substantial evidence or otherwise in accordance with law.**

a.          *Parties' Contentions*

Plaintiffs contend Commerce should not have applied a partial adverse inference in selecting from among facts otherwise available for the labor factor of production for HFTC30's direct sales suppliers.  Plaintiffs claim Commerce should not assume that all suppliers for HFTC30's direct sales were uncooperative in their labor reporting simply because the labor factors for one supplier could not be verified.  Plaintiffs cite a 1992 investigation in which Commerce refused to apply the verified information from two producers to two different, unverified producers.  *Id*. at 28 (citing *Final Determination of Sales at Less Than Fair Value: Sulfanilic Acid from the People's Republic of China*, 57 Fed. Reg. 29,705, 29,708-709 (July 6, 1992) (*Sulfanilic Acid*)).  Plaintiffs also cite the Uruguay Round Agreements Act to reiterate that before Commerce may apply adverse inferences, it must find a willful act by respondents not to comply.  Plaintiffs stress there is no evidence on the record that the processors did not fully cooperate and use their best ability to supply information requested by Commerce.

Defendant asserts Commerce properly applied partial adverse inferences for the labor factors of production for all HFTC30 direct sales suppliers based upon the labor factors from Huaiyin Freezing.  Defendant argues it was reasonable for Commerce to assume the other suppliers' labor factors were as unverifiable as those of Huaiyin Freezing.  For support, Defendant points to Baoying Freezing's unverifiable labor factors.  Defendant states that HFTC30's pattern of providing consistently unverifiable information led to Commerce's proper

exercise of discretion in applying adverse inferences to HFTC30's other direct sale suppliers. Defendant distinguishes *Sulfanilic Acid*, where each factory had unique factors of production, from the case at hand, where the factors of production for each factory are not unique.

### b. Analysis

It is undisputed that an interested party provided information to the agency that could not be verified. Therefore, Commerce may resort to the use of facts otherwise available. *See* 19 U.S.C. § 1677e(a). However, the Department has not demonstrated to this Court that substantial evidence on the record supports the application of an adverse inference in selecting from among facts otherwise available for the labor factor of production for HFTC30's first sales channel.

In considering whether substantial evidence supports Commerce's application of a partial adverse inference to HFTC30's first channel sales, this Court applies the same analysis set forth in its discussion of the second channel sales. First, this Court finds Commerce has failed to articulate its reasons for concluding that HFTC30 failed to act to the best of its ability to comply with Commerce's requests for information for first channel sales. Although no party disputes HFTC30's ability to comply with Commerce's requests for information, Commerce has failed to show that HFTC30 made a willful decision not to comply or that it gave insufficient attention to its statutory duties. The Department merely states:

> Bearing in mind that Baoying's reported labor factors were also unverifiable, it is reasonable for the Department to assume that the labor factors for [HFTC30's] other processors contained similar problems with accuracy. Moreover, since [HFTC30] submitted factors of production data for its suppliers to the Department, it is reasonable to assume that [HFTC30] exercised the same level of care in ensuring the accuracy of its other suppliers' factor information as it did with the two processors we selected for verification.

*Decision Memo* at 37.

Such assumptions, without more, are unreasonable within the context of HFTC30's first channel sales. Commerce does not point to substantial evidence on the record to indicate that HFTC30's error regarding Huaiyin Freezing's labor factors was anything more than inadvertent. HFTC30 submitted only one unverifiable factor of production for Huaiyin Freezing in contrast to submitting ten unverifiable factors for Baoying Freezing. Given the consistent errors in Baoying Freezing's numbers, Commerce reasonably concluded that HFTC30 had failed to cooperate to the best of its ability regarding Baoying Freezing. However, the same reasoning is faulty when applied to HFTC30's treatment of Huaiyin Freezing. Huaiying Freezing's unverifiable labor factor, unlike Baoying Freezing's, is not clearly one of a pattern of errors.

Second, Commerce has failed to explain the unverifiable labor factor's significance to the review. This Court will not speculate upon its significance.

Commerce's application of an adverse inference to all first sales channel suppliers is unsupported by substantial evidence on the record or otherwise not in accordance with law. This Court remands to Commerce to reconsider and further explain whether an adverse inference should apply to HFTC30's first sales channel labor factors and to determine, if needed, the appropriate labor factor to apply.

**III.    Commerce's application of a 201.63 percent rate for HFTC30's second channel sales is supported by substantial evidence on the record or otherwise in accordance with law.**

**a.        *Parties' Contentions***

Plaintiffs argue that in applying an adverse inference Commerce chose an unreasonably

high rate with no relationship to the actual dumping margin.  Defendant counters that, as 19

U.S.C. § 1677e(b) allows inferences based upon information derived from a previous review or

from "any other information placed on the record," Commerce properly relied upon the highest

calculated margin from any segment of the proceeding.  Defendant points out that the 201.63

percent rate used for adverse inferences in this case was corroborated in the underlying

investigation and in the immediately preceding first administrative review.

####       b.        Analysis

Commerce's choice of a 201.63 percent dumping margin for its application of an adverse

inference to HFTC30's second channel sales is supported by substantial evidence on the record or

otherwise in accordance with law.  It is "within Commerce's discretion to choose which sources

and facts it will rely on to support an adverse inference when a respondent has been shown to be

uncooperative."  *F.lii De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d

1027, 1032 (Fed. Cir. 2000) ("*De Cecco*").  An "adverse facts available rate," however, should

be "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in

increase intended as a deterrent to non-compliance."  *Id*.

In this case, the 201.63 percent margin clearly acts as a deterrent to non-cooperation.  In

addition, it is reasonably related to HFTC30's dumping margin because, as the highest rate found

in any segment of the proceeding, it was corroborated in the underlying investigation.  *See*

*Antidumping Duty Order*, 62 Fed. Reg. at 41,349-50 (discussing Commerce's arrival at 201.63

percent margin for all firms not fully responsive to its requests for information).  Plaintiffs

repeatedly assert the 201.63 percent margin is "punitive."  However, Plaintiffs have not

demonstrated why a corroborated 201.63 percent margin applied to other uncooperative firms

should become "punitive" when applied to HFTC30.  Neither do Plaintiffs' proposed alternatives persuade this Court that the 201.63 percent margin is unrelated to HFTC30's actual dumping margin for second channel sales.  Commerce's use of a corroborated dumping margin, rather than unverified factors of production data from other HFTC30 suppliers, has allowed it to reach a reasonably accurate estimate of HFTC30's actual dumping margin.

**IV.    Commerce's assignment of a surrogate value to the well water consumed in the production of certain subject merchandise is supported by substantial evidence on the record or otherwise in accordance with law.**

*a.  Parties' Contentions*

Plaintiffs contend the Department improperly assigned a surrogate value to the well water consumed in the production of certain subject merchandise.  Plaintiffs claim that because some producers do not incur a cost for the water pumped from their wells, the Department should not have valued it.  Plaintiffs assert that to value the water would be inconsistent with the statute which requires Commerce to determine normal value "on the basis of the value of the factors of production . . . ." 19 U.S.C. § 1677b(c)(1).   Instead, Plaintiffs state Commerce should have added to its margin calculations only the electricity used to pump the water from the wells.

Defendant argues Commerce's determination to value separately water consumed in the crawfish tail meat production is supported by substantial evidence and is otherwise in accordance with law.  Defendant states Commerce followed longstanding practice by finding the suppliers used water for more than "incidental purposes" to determine water was a direct factor of production.  Defendant adds there is no record evidence that electricity costs for pumping water were reported to Commerce as overhead costs and points to previous segments of the proceeding

where Commerce valued water as a direct material cost.  Finally, Defendant states it is irrelevant that crawfish processors did not incur a cost for the water because in constructing normal value in a non-market economy, the statute requires Commerce to base its factors of production upon quantities of inputs rather than the costs associated with them.

**b.**     ***Analysis***

Commerce's decision to assign surrogate values to water used in crawfish tailmeat production is supported by substantial evidence on the record or otherwise in accordance with law.  First, the statute plainly focuses upon the quantity of inputs for factors of production rather than the costs associated with them.  It states that "the factors of production utilized in producing merchandise include, but are not limited to – (A) hours of labor required, (B) *quantities* of raw materials employed, (C) *amounts* of energy and other utilities consumed, and (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3) (emphasis added).  Second, water constitutes a factor of production in this case because of its use for more than incidental purposes. *See Decision Memo* at 22.   Finally, because Commerce could not know whether the respondents included water cost in their factory overhead, Commerce reasonably determined to value water separately. *Id*.  This is consistent with Commerce's past treatment of water in this proceeding, and Plaintiffs point to no record evidence provided to Commerce to cause it to deviate from this practice.

**V.      The Byrd Amendment did not cause Plaintiffs' due process rights to be violated.**

   *a.  The Continued Dumping and Subsidy Act of 2000 ("Byrd Amendment")*

Through the imposition of duties, the Antidumping Act of 1921 (the Act) equalizes competitive conditions between foreign exporters and domestic industries affected by dumping. *See Huaiyin Foreign Trade Corp. (30) v. United States Dept. of Commerce,* 201 F. Supp. 2d 1351, 1363 (Ct. Int'l Trade 2002) ("*Huaiyin 30*") (quoting *C.J. Tower & Sons v. United States*, 71 F.2d 438, 445-46 (C.C.P.A. 1934)).  Previously, the duties collected pursuant to the Act were deposited with the Treasury for general purposes, such as to provide revenue to regulate commerce.  *See Huaiyin 30*, 210 F. Supp. 2d at 1363.  In 2000, however, Congress modified the statute by passing the Byrd Amendment, which states:

> Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures. Such distribution shall be known as the "continued dumping and subsidy offset."

19 U.S.C. § 1675c(a).  Pursuant to the Amendment, the duties are distributed to the domestic firms that petition for relief and to those that supported the petition.  *See* 19 U.S.C. § 1675c(b)(1)(A), (B).  The Amendment applies retroactively to assessments made on or after October 1, 2000, as well as to ongoing antidumping review investigations of subject entries prior to October 1, 2000.  *See* 19. U.S.C. § 1675c(a).

   *b.  Parties' Contentions*

Plaintiffs claim that under the Byrd Amendment, property is taken away from importers and given to the petitioners without full due process of law under the Fifth

Amendment to the Constitution. Plaintiffs also argue the Byrd Amendment effectively transforms U.S. antidumping law into a civil damage action. Instead of equalizing competitive conditions, Plaintiffs assert the dumping duty now penalizes the foreign exporter. Therefore, Plaintiffs contend the Byrd Amendment alters the antidumping law into a punitive statute and that as U.S. entities, they are entitled to full due process rights under the U.S. Constitution, including a hearing before a neutral judge. Plaintiffs request a remand to Commerce for a hearing before a neutral judge.

Defendant contends the doctrine of exhaustion of administrative remedies precludes Plaintiffs from presenting the due process argument in this Court because Plaintiffs never raised the issue at the administrative level. Defendant also asserts Plaintiffs were afforded full due process rights in the underlying administrative action through "multiple opportunities to submit relevant information, the opportunity to comment upon Commerce's verification results and submit case and rebuttal briefs, and an administrative hearing." (Def.'s Opp'n Pls.' Mot. J. Agency R. at 33.)

Were the Court to consider Plaintiffs' due process argument, however, Defendant argues the claim has no merit; the Byrd Amendment neither altered the responsibilities of Commerce or importers, nor did it change the existing administrative procedures. Defendant claims the Byrd Amendment does not change the antidumping law's remedial purpose into a punitive one.

### b.  *Analysis*

#### (i)  Doctrine of Exhaustion

The doctrine of exhaustion dictates that a party must present a claim for the relevant administrative agency's consideration prior to raising it before the Court.  *See Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998).  There is no absolute statutory requirement of exhaustion in non-classification cases, however, because 28 U.S.C. § 2637(d) states that the Court of International Trade "shall *where appropriate*, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d) (emphasis added).  The phrase "where appropriate" authorizes this Court to determine the proper exceptions to the doctrine of exhaustion as well the circumstances under which it will be required.  *See Koyo Seiko Co., Ltd. v. United States*, 186 F. Supp. 2d 1332, 1338 (Ct. Int'l Trade 2002) ("*Koyo Seiko*").

Such exceptions have included situations in which it would have been futile to raise the issue below.  *See id*.  This Court finds it would have been futile for Plaintiffs to raise the due process issue in the administrative proceeding because Commerce lacked authority to make any decision regarding the constitutionality of the Byrd Amendment. *See Thomson Consumer Elecs., Inc. v. United States*, 247 F.3d 1210, 1215 (Fed. Cir. 2001); *see also Moore v. East Cleveland*, 431 U.S. 494, 497, n.5 (1977) (plurality opinion); *Mathews v. Diaz*, 426 U.S. 67, 76 (1976).  Congress, which passed the Byrd Amendment to further the antidumping law's remedial purposes, did not grant Commerce the authority to label the Amendment punitive.  *See Huaiyin 30*, 201 F. Supp. 2d at 1364-1365.  Furthermore, because the due process issue is one of law that requires no further

factual development by the Department, the Court may consider the question without interfering with the Department's province. *See Koyo Seiko*, 186 F. Supp. 2d at 1338*; see also Timken Co. v. United States*, 630 F. Supp. 1327, 1334 (Ct. Int'l Trade 1986).

### (ii) Due Process Rights and the Byrd Amendment

Central to Plaintiffs' contention is the argument that payment of duties to petitioners makes the antidumping laws punitive in nature. This Court, however, addressed this argument in *Huaiyin 30* when it described two characteristics of a penalty that do not characterize antidumping duties despite passage of the Byrd Amendment. *See Huaiyin 30*, 201 F. Supp. 2d at 1363-64. First, a penalty amount usually has no relation to the cost of remedying the harm caused by a prohibited act. *Id*. (citing *United States v. DelBellas*, 23 CIT 600, 601 (1999). After passage of the Byrd Amendment, however, the amount of antidumping duty assessed continues to be "directly related to the remedial goal of equalizing competitive conditions." *Huaiyin 30*, 201 F. Supp. 2d at 1364 (internal quotations omitted). Importers continue to be liable for duties equal to the amount by which the normal value exceeds the export or constructed export price for the merchandise. *See* 19 U.S.C. §§ 1673 and 1673e(a). Second, "a duty may constitute a penalty where it is 'enormously in excess of the greatest amount of regular duty ever imposed upon an article of the same nature . . . .'" *Huaiyin 30,* 201 F. Supp. 2d at 1364 (quoting *Helwig v. United States*, 188 U.S. 605, 611-13 (1902)). Because the antidumping duty assessed here is identical to that assessed prior to implementation of the Byrd Amendment, the amount cannot be considered so large as to constitute a penalty. *See Huaiyin 30*, 201 F. Supp. 2d at 1364.

In addition, this Court found that Congress "sought to change the antidumping law in order to strengthen its remedial purpose." *Id*. at 1365 (citing Agriculture, Rural Development, Food and Drug Administration and Related Agencies Appropriations Act of 2000, Pub. L. No. 106-387, Title X § 1002(3), (5), 114 Stat. 1549 (2000)). The imposition of duties does not constitute the exclusive means of remediation, and Congress has exercised its constitutional powers in choosing to further the goal of remediation through the distribution of collected duties to parties affected by dumping. *Id*. at 1365-66.

The Court is not persuaded that the Byrd Amendment transforms the antidumping regime into one that imposes a penalty and therefore finds Plaintiffs' Fifth Amendment due process claim to be without merit.

## CONCLUSION

Upon consideration of Plaintiffs' Rule 56.2 motion for judgment upon the agency record, Defendant's response, and Plaintiffs' reply, Plaintiffs' motion is denied. The Department of Commerce's *Final Results*, as amended, is affirmed in part and remanded in part. The Court remands to Commerce to reconsider and further explain whether an adverse inference should apply to HFTC30's first sales channel labor factors and to determine, if needed, the appropriate labor factor to apply. Plaintiffs' motion for a hearing is denied.

_____
Gregory W. Carman, Chief Judge

Dated: August 6, 2002
        New York, NY