**Slip Op. 02-152**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| USINOR INDUSTEEL, S.A., DUFERCO CLABECQ, S.A., AG der DILLINGER HÜTTENWERKE, SALZGITTER AG STAHL und TECHNOLOGIE, and THYSSEN KRUPP STAHL AG, | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Consolidated Court No. 01-00006 **Public Version** |
| THE UNITED STATES, | : : | |
| Defendant, | : : | |
| and | : : | |
| BETHLEHEM STEEL CORPORATION and U.S. STEEL GROUP, A UNIT OF USX CORP., | : : : | |
| Defendant-Intervenors. | : : | |

[ITC Remand Determination remanded.]

Dated: December 20, 2002

Barnes, Richardson, & Colburn (Gunter von Conrad and Stephen W. Brophy) for plaintiff Usinor Industeel, SA.

White and Case LLP (Walter J. Spak, Lyle B. Vander Schaaf, Frank H. Morgan, and Joseph H. Heckendorn) for plaintiff Duferco Clabecq, S.A.

DeKieffer and Horgan (Marc E. Montalbine and Merritt R. Blakeslee) for plaintiffs AG der Dillinger Hüttenwerke, Salzgitter AG Stahl und Technologie and Thyssen Krupp Stahl AG.

Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, United States International Trade Commission (Rhonda M. Hughes), for defendants.

Dewey Ballantine LLP (Alan Wm. Wolff and Kevin M. Dempsey) and Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, and James C. Hecht) for defendant-intervenors Bethlehem Steel Corporation and U.S. Steel Group, a unit of USX Corporation.

## OPINION

**RESTANI, Judge:**  This matter comes before the court following its decision in Usinor Industeel, S.A. v. United States, No. 01-00006, Slip Op. 02-39 (Ct. Int'l Trade 2002) (hereinafter "Usinor I"), in which the court remanded certain aspects of the final determination of the U.S. International Trade Commission ("Commission" or "ITC") in its five-year sunset review of antidumping and countervailing duty orders in Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 65 Fed. Reg. 75,301 (Int'l Trade Comm'n 2000) (hereinafter Final Determination).[1]  Familiarity with that decision is presumed. On remand, the court instructed the ITC to apply the common meaning of "likely," i.e. probable, in conducting its sunset review analysis.  The court also required the ITC to address respondents' argument that developments in the European Union ("EU") militate against an affirmative determination and cite substantial evidence in the record showing that injury by reason of subject imports remains likely despite these changes.

_____

[1]  On November 2, 2000, the Commission determined that revocation of the countervailing and antidumping duty orders on certain steel products, i.e. certain cut-to-length steel plate ("CTL plate"), from Belgium, Brazil, Finland, Germany, Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom would be likely to lead to a continuation or recurrence of material industry in the United States within a reasonably foreseeable time.  The Commission also determined that revocation of an antidumping duty order on CTL plate from Canada would not be likely to lead to a continuation or recurrence of material injury to the domestic industry.  The determinations pertaining to Belgium and Germany were appealed to the court.

On remand, the Commission again determined that revocation of antidumping duty orders on certain CTL plate from Belgium and Germany would be likely to lead to a continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time. AG der Dilllinger Hüttenwerke, Salzgitter AG Stahl und Technologie, and Thyssen Krupp Stahl AG (collectively the "German Producers"), Usinor Industeel, S.A., Duferco Clabecq, S.A., respondents in the underlying investigation, contest the Commission's July 1, 2002 remand determination (hereinafter Remand Determination") on the grounds that (1) the Commission continues to apply an improper standard to its review; (2) the Commission ignored volume and pricing data submitted by the German Producers in deciding to cumulate German CTL plate with that of the remaining countries; (3) upon cumulation, the Commission's determination of likely injury is not supported by substantial evidence; and (4) the Commission did not analyze the effect of the failure of certain domestic producers to provide information. In addition, Duferco Clabecq, S.A. ("Duferco") raises a new issue regarding the effect of the exclusion of floor plate from the scope of subject merchandise as required under Duferco Steel, Inc. v. United States, No. 01-1443 (Fed. Cir. July 12, 2002).

## DISCUSSION

In a sunset review, the Commission determines whether revocation of an order "would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1) (2000). To determine the likelihood of material injury, the Commission shall consider the likely (1) volume, (2) price effect, and (3) impact of the subject imports on the domestic industry if the order were revoked. Id. Before conducting this analysis, the Commission determines whether it should cumulatively assess the volume and effect of

subject imports from all countries for which sunset reviews were initiated on the same day.  19

U.S.C. § 1675a(a)(7).

**I.      Likely**

As an initial matter, although the Commission states that it determined whether injury

was likely according to the instructions of the court, it continues to challenge the court's

determination that the term "likely," as provided throughout the sunset review analysis, is clear

and should be given its common meaning in proceeding with sunset reviews.[2]  The Commission

devotes a substantial portion of the Remand Determination to arguing that "the term 'likely'

captures a concept that falls in between 'probable' and 'possible' on a continuum of relative

certainty."  Remand Determination at 6.[3]  The court has addressed the Commission's position on

this issue twice before.  In the initial determination, the Commission did not explain its

application of the "likely" standard.  In Usinor I, the court determined that, among other things,

---

[2] The  "likely" standard is applied in several sunset review analyses.  See, e.g., 19 U.S.C.
§ 1675a(a)(1) (likelihood of injury upon revocation); § 1675a(a)(2) (volume); § 1675a(a)(3)
(price effects); § 1675a(a)(4) (impact on domestic industry); and § 1675a(a)(7) (cumulation,
competition overlap, discernible adverse impact).

[3] Commissioners Hillman and Koplan depart from the Commission's untenable position
and express views consistent with the court's opinion.  Commissioner Hillman likens her
approach to a standard of "whether it is 'more likely than not' that material injury would continue
or recur upon revocation."  Remand Determination, Separate Views of Vice Chairman Jennifer
A. Hillmand Regarding the Interpretation of the Term "Likely",  at 2.  Commissioner Koplan
accepts the court's conclusion that likely is synonymous with "probable."

> If some event is likely to happen, under the common usage of the term, it probably will
> happen.  If one considers the term "probable" to be tantamount to "more likely than not,"
> then in the context of a sunset review such as this one, upon revocation of the respective
> orders either injury probably will continue or recur (more likely than not) or it probably
> will not continue to recur.

Remand Determination, Dissenting Views of Commissioner Stephen Koplan, at 1.

the Commission's heavy reliance upon excess capacity to predict future volume, without more, suggested that the Commission's final determination might be based on "possible" future imports of subject plate rather than likely imports. Usinor I, Slip Op. 02-39 at 14. The court determined that the statute was clear and that the term should be given its ordinary meaning, i.e. probable, upon remand.[4]

The Commission sought interlocutory appeal, arguing that the Statement of Administrative Action, ("SAA") accompanying H.R. Rep. No. 103-826(I), at 883, reprinted in 1994 U.S.C.C.A.N. 4040, 4212, contains an alternative definition.[5] In Usinor Industeel, S.A. v. United States, No. 01-00006, Slip Op. 02-75 (Ct. Int'l Trade 2002) ("Usinor II"), the court addressed this argument at length and declines to do so again here.[6] The court rejects the

---

[4] The proper application of "likely" in sunset reviews has also been discussed in other cases. See, e.g., Usinor v. United States, No. 01-00010, Slip Op. 02-70 at 22 (Ct. Int'l Trade July 19, 2002) (concluding that the term likely is clear and should be given its ordinary meaning - probable); see also AG der Dillinger Huttenwerke v. United States, No. 00-09-00437, Slip. Op. 02-107 at 8 (Ct. Int'l Trade Sep 05, 2002) (determining that Commerce must find that countervailable benefits are "probable").

[5] The SAA reads:

The determination called for in these types of reviews is inherently predictive and speculative. There may be more than one likely outcome following revocation or termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping or countervailable subsidies, or injury, is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order or suspended investigation will be continued.

SAA at 883 (emphasis added).

[6] Although the court's two prior opinions in this matter make clear that the court recognizes the importance of the SAA, the Commission continues to insist that the court has disregarded the SAA's unique status. As indicated previously by the court, ambiguous

Commission's attempt to diminish the clear statutory standard by adopting a purposely ambiguous standard, a moving target somewhere between "possible" and "probable," in order to couch almost any affirmative determination as consistent with the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA").

## II.      Floor Plate from Belgium

In addition to challenging various remand determinations, Plaintiff Duferco Clabecq, SA ("Duferco") raises a new issue regarding the Commission's consideration of floor plate data. In Duferco Steel, Inc. v. United States, No. 01-1443 (Fed. Cir. July 12, 2002), the United States Court of Appeals for the Federal Circuit ("CAFC") determined that the U.S. Department of Commerce ("Commerce") erred by including floor plate from Belgium in the scope of the original final antidumping and countervailing duty orders in this case.[7] Duferco argues that, because the CAFC has now excluded floor plate from the scope of subject merchandise at issue,

---

provisions of the SAA should not be interpreted to conflict with clear statutory provisions. This seems a wholly unremarkable proposition. Furthermore, the court has not interpreted "likely" to imply any degree of "certainty." If the Commission majority is still confused as to the court's understanding of the plain term "likely," it might refer to the separate opinions of its own members, Hillman and Koplan.

[7] In discussing whether floor plate should have been included in the scope of subject merchandise (CTL plate), the CAFC determined that the critical question is whether the original 1993 final scope orders included the subject merchandise. Duferco, Slip Op. at 14 (citing 19 U.S.C. §§ 1671d(a)(1) & 1673d(a)(1)). The court determined that the original 1993 final order did not expressly include floor plate nor could it reasonably be interpreted to include floor plate. Id. at 12. The court rejected Commerce's reliance upon the initial petitions as evidence. "Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order." Id. at 14. The court held that "Commerce's 1999 final scope ruling, interpreting its 1993 final scope orders to include imported plate 'with patterns in relief derived directly from the rolling process,' is invalid." Id. at 19.

the data relied upon by the Commission will significantly change and, therefore, this matter should be remanded for reconsideration.

It is undisputed that the Commission treated floor plate as subject merchandise in this sunset review. Staff Report at Plate-II-9. The Commission concedes that exports of now non-subject floor plate originally accounted for [   ] of the "subject" exports from Belgium during the period of review ("POR"). See Foreign Producer Questionnaire Response of Industeel and Duferco Clabecq at Response to Question II-17.[8] Duferco argues that, because there were [   ] exports of subject plate during the POR, capacity, production, and volume data will have been overstated and that capacity utilization rates may change. In addition, Duferco argues that pricing data from its domestic importing affiliate, Duferco Steel, Inc., should be removed from consideration.

The Commission responds that the CAFC decision is not binding because the case concerned a Department of Commerce determination. It is well established, however, that "Commerce has inherent authority to define and clarify the scope of an antidumping duty investigation." San Francisco Candle Co. v. United States, 206 F. Supp. 2d 1304, 1308 (Ct. Int'l Trade 2002) (citing Koyo Seiko Co. v. United States, 17 CIT 1076, 1078, 834 F. Supp. 1401, 1403 (1993), aff'd, 31 F.3d 1177 (Fed. Cir. 1994)). In conducting its initial injury determination under 19 U.S.C. § 1673d(b)(1), "the International Trade Commission ('ITC') must make its determination of like product and its determination of injury in relation to Commerce's definition of the class or kind of imported merchandise being investigated." Smith Corona Corp. v. United States, 16 CIT 562, 565, 796 F. Supp. 1532, 1535 (1992); see also 19 U.S.C. § 1673a(a)(1)

---

[8] Duferco and Usinor were the sole Belgian producers of CTL plate during the POR.

(providing that the merchandise subject to investigation is the "class or kind of merchandise" as to which Commerce has initiated an antidumping investigation).  In its sunset review analysis, the Commission considers the "likely volume, price effect, and impact of imports of <u>subject merchandise</u>" in determining whether revocation of orders are likely to lead to a continuation or recurrence of material injury.   19 U.S.C. § 1675a(a)(1) (emphasis added).  In addition to reviewing data collected during the POR regarding <u>subject merchandise</u>, the Commission relies upon its initial determinations regarding <u>subject merchandise</u>.  Commerce's determination of the scope of subject merchandise at issue, therefore, has a direct impact on the Commission's sunset review analysis, and the CAFC's revision of Commerce's scope is binding on both the ITC and, for purposes of review of the ITC determination, the court.

The Commission next argues that <u>Duferco</u> is not final because Commerce may yet seek reconsideration of the ruling, move for a rehearing en banc, or appeal the ruling to the Supreme Court.  The possibility of further review does not make <u>Duferco</u> any less binding upon this court. "[T]he doctrine of stare decisis dictates that an appellate court and lower courts bound by that court's decision abide by an appellate court decision unless it has been reversed by the same court sitting en banc or by the Supreme Court." <u>Anselmo v. King</u>, 902 F. Supp. 273, 276 n.2 (D.D.C. 1995) (citing <u>Brewster v. Comm'r of Internal Revenue</u>, 607 F.2d 1369, 1373 (D.C. Cir. 1979); <u>United States v. Caldwell</u>, 543 F.2d 1333, 1369 n.19 (D.C. Cir.1974), <u>cert. denied</u>, 423 U.S. 1087 (1976)).   In any case, the CAFC decision was issued on July 12, 2002.  The CAFC issued its mandate formally relinquishing jurisdiction on September 3, 2002.  This court has already entered judgment in reliance upon that decision.  <u>Duferco Steel, Inc. v. United States,</u> Slip Op. 02-125 (Ct. Int'l Trade Oct. 17, 2002).  The matter appears final.

The Commission next contends that its final determination as to the likely continuation or recurrence of material injury to the domestic plate industry was made on the basis of cumulated imports and that, because Belgium's plate shipments represented a fraction of those imports, any change would not be determinative. Whether the absence of Belgian imports is meaningful to the overall analysis remains to be seen.[9] It is, however, possible that the Commission may now decline to cumulate Belgium with the remaining countries. Deciding whether imports from Belgium are likely to have no adverse impact becomes an entirely different analysis when there were [     ] subject imports.[10] It will certainly be more difficult to establish likely volume from Belgium. Both the Commission and Defendant-Intervenors argue that Duferco's reliance upon [

          ] U.S. imports is misleading because, in addition to producing non-subject floor plate, Duferco continued to manufacture subject plate, see Staff Report at TABLE CTL-SUPP-1,[11] and exported a substantial percentage of its production. See Final Determination at 30 & n.101. The Commission may be correct that "simply because Belgium shipped [        ] floor plate to the United States during the period of review does not mean it will not [

     ] in the future." While Belgian production and exportation may support the possibility of future U.S. imports, [                          ] subject imports during the POR certainly weighs

---

[9] The data relied upon by the Commission states that, in 1998 and 1999, Belgium was the [      ] largest importer of subject plate amongst the cumulated countries. See Staff Report at Table PLATE-IV-I. The removal of those imports from consideration is, if not determinative, at least significant.

[10] For example, the Commission's reliance here upon the initial 1993 determination to establish future volume from Belgium is problematic because that determination also considered and relied upon data regarding non-subject floor plate.

[11] The Staff Report indicates that [       ] percent of the Belgian plate production in 1999 was subject plate. TABLE CTL-SUPP-1.

against that finding.  Moreover, as discussed, that possibility is not enough.  The Commission

must now cite substantial evidence that is unrelated to floor plate to support likely volume.

The Commission last argues that Duferco's new argument should be disregarded in the

interests of administrative finality.  The Commission argues that Duferco should instead seek a

changed circumstances review under 19 U.S.C. § 1675(b).  The court acknowledges that the ITC

has an important legitimate interest in finality.  The court realizes that the Commission had no

knowledge that floor plate was not subject merchandise at the time it made its determination.

This case is unique, however, in that the CAFC has issued an intervening opinion that directly

affects the data considered by the Commission and possibly the outcome of this sunset review.[12]

The court may remand a determination where, as here, potentially determinative events occur

after the determination but in the course of an appeal.  See Borlem S.A. Empreedimentos

Industrias v. United States, 913 F.2d 933, 939 (Fed. Cir. 1990).  As will be discussed infra, the

court finds that the Commission otherwise properly considered the record before it.

Nevertheless, the court cannot affirm the Commission's remand determination so long as it is

based, in any significant part, upon data relating to non-subject merchandise.  In addition,

---

[12]  The doctrine of exhaustion of administrative remedies generally requires that a party present a claim at the agency level prior to raising it before the court.  See Pacific Giant, Inc. v. United States, 223 F. Supp. 2d 1336 (Ct. Int'l Trade 2002) (citing Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998)).  "There is no absolute statutory requirement of exhaustion in non-classification cases, however, [sic] 28 U.S.C. § 2637(d) states that the Court of International Trade 'shall where appropriate, require the exhaustion of administrative remedies.'"  Pacific Giant, Inc., 223 F.Supp.2d at 1347-58 (citing Koyo Seiko Co. v. United States, 186 F. Supp. 2d 1332, 1338 (Ct. Int'l Trade 2002) (concluding that the phrase "where appropriate" authorizes this court to determine the proper exceptions as well the circumstances where exhaustion is required.).  The court may decline to require exhaustion where an intervening court decision may materially affect the present action.  Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986).  That is the case here.

requiring Duferco to seek a changed circumstances review when the issue can be decided now would be an inefficient use of government resources. Because the Commission's findings relied upon what is now improper data regarding floor plate imports from Belgium, the court regretfully must remand this matter again. Upon remand, the Commission should either allow Duferco Clabecq, Duferco Steel Inc., and, if necessary, Usinor, to re-report their data to exclude floor plate or the Commission should explain how it can properly reevaluate the information without reopening the record. The Commission should reconsider whether to cumulate Belgian imports and review the effect of Duferco on the broader cumulated determination. In doing so, the Commission should review its reliance upon the original 1993 determination to the extent that determination was also based upon floor plate.

## III. Cumulation

In addition to Duferco's argument above, Plaintiffs again collectively challenge the Commission's decision to cumulate German and Belgian imports of subject plate. In the context of a sunset review, the Commission may exercise its discretion to cumulate subject imports from different countries if such imports "would be likely to compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1675a(a)(7). In addition to determining whether there is reasonable competition overlap, the Commission also considers the likely conditions of competition that would prevail upon revocation. Usinor I, Slip Op. 02-39 at 8 (citing Certain Steel Wire Rope from Japan, Korea, and Mexico, USITC Pub. 3259, Inv. No. 731-TA-547, at 11 (Dec. 1999) (five-year review)). In addition, the Commission may not cumulate imports from a country if it determines that subject imports from that country are likely

to have "no discernible impact" on the domestic industry.[13]  Id.

### A.        No Discernable Impact

As discussed in Usinor I, there is no statutory provision enumerating the factors to be

considered in determining whether subject imports from a particular country are likely to have no

discernible impact.  The Commissioners themselves differ as to approach.  Usinor I, Slip Op. 02-

39 at 9.  The Commission generally considers the "likely volume of the subject imports and

likely impact of those imports on the domestic industry within a reasonably foreseeable time."

Final Determination at 22.  The analysis of likely volume is similar to that in both the basic

cumulation test and the overall sunset review analysis.

In both the Initial Determination and Remand Determination, the Commission found that

(1) the size of the industry in Belgium and Germany was significant; (2) each had substantial

capacity to produce all types of plate products; (3) actual production of subject plate was

significant; and (4) most countries export a substantial percentage of their production.  Final

Determination at 20.[14]  Based upon these findings, the Commission determined that significant

---

[13] "The Commission shall not cumulate imports from any country if those imports are likely to have no discernible impact on the domestic industry."  SAA at 887.

[14] The Commission found that the types of plate produced in the subject countries, including Belgium and Germany, did not differ "dramatically" from those produced in the United States and, therefore, would be substitutable for, and competitive with, domestic plate.  Final Determination at 31.  The Commission also determined that the capacity of each country, including Belgium and Germany, to produce all types of plate was equivalent to over five percent of U.S. consumption, except with regard to Canada.  See Final Determination at 30; Staff Report at Tables PLATE-IV-3-13.  The Commission calculated that the capacity of Belgium to produce subject plate was [          ] short tons in 1997, [          ] short tons in 1998, and [          ] short tons in 1999.  See Staff Report at Table PLATE-IV-3.  The capacity of Germany to produce subject plate was [          ] short tons in 1997, [ 2,178,200 ] short tons in 1998, and [          ] short tons in 1999.  See Staff Report at PLATE-IV-7.  Germany operated at higher capacity utilization rates than most countries but, because Germany's plate industry is so large,

future volume was likely.  Id.

The court found no error in the Commission's initial findings in isolation.  For example, in Usinor I, the court found that the Commission did not err in finding that foreign CTL plate, if imported, would likely compete with domestic plate or in concluding that foreign CTL plate, if imported, would have a discernible adverse impact on the domestic industry.  See Slip Op. 02-39 at 12.  In discussing the overall application of the likely standard, however, the court had serious questions as whether the Commission had established that future volume of CTL plate in significant quantities was likely.  As discussed above, the Commission's findings with respect to Belgium are remanded so that the Commission can reconsider its position without relying upon floor plate data.  The primary argument in Usinor I, however, involved developments in the EU.

**1.      Changes in the European Union**

In proceedings before the Commission and in briefing this matter before the court, Plaintiffs submitted evidence to support their claim that, due to recent changes in the EU, CTL plate shipments to the U.S. were not likely upon revocation.  Plaintiffs argued that integration of customs laws and procedures in the EU made it unlikely that Belgian and German producers would now shift sales to the U.S.  Usinor I, Slip Op. 02-39 at 17.  Plaintiffs pointed to substantial changes in European trade laws, including the creation of the European Single Market ("ESM") and adoption of a single currency, the euro, as reducing barriers to intra-community trade and essentially transforming the EU into one large "home market" for EU producers.  The German Producers argued that these developments created a more profitable European market for German

---

the remaining German capacity actually exceeds that in other countries with smaller industries that operate at lower capacity utilization rates.

CTL plate producers.  The German producers submitted evidence that German CTL plate sales to other EU member countries had noticeably increased and that, by 1999, 90% of German CTL plate sales were either to Germany or to other EU countries.  Usinor I, Slip Op. 02-39 at 18.

Without citation or explanation, the Commission briefly responded to Plaintiffs' key argument in a summary footnote: "we are not convinced that there has been a shift of such fundamental nature [in the EU] as to make significant exports to the United States unlikely." Final Determination at 40, n.155.  The court found this explanation inadequate and ordered that, upon remand, the Commission analyze the effects of these changes and address Plaintiffs' argument that these changes make subject imports to the U.S. unlikely.

In its Remand Determination, the Commission reviewed the process of economic integration in Europe over the last half century, noting that the European Economic Community was formed by the Treaty of Rome in 1957 and that, by 1968, the original six member countries had eliminated tariffs on trade in goods between them.  Remand Determination at 19.  By 1986, the European Economic Community had expanded to twelve member countries and the Single Europe Act of 1986 provided for the elimination of internal customs border checks and for other harmonization measures by 1992, after which the European Economic Community became known as the EU.  While the Commission acknowledges that the EU has the potential to reduce CTL plate exports to the US compared to the original investigation, id. at 20, the Commission argues that economic integration had taken place before the investigation and did not prevent EU countries from exporting subject plate at volumes and prices that were injurious to the domestic industry.

The German Producers respond by arguing that the Commission understates the changes

in the EU and effectively places the burden on foreign producers to prove that imports of subject

plate are unlikely to avoid continuation of antidumping and countervailing duty orders. The

German Producers argue that the Commission's retrospective view of European integration is

flawed. The German Producers point out that ESM was not created until 1993, after the initial

investigation. The German Producers compare the European arrangement prior to 1993 as

operating much like the North American Free Trade Agreement ("NAFTA") – internal tariffs

were reduced or eliminated but all customs checks and formalities remained. Plaintiffs further

argue that, with the establishment of the ESM, persons, goods, services, and capital could move

freely throughout the EU. The German Producers argue that these changes caused a siginificant

increase in intra-EU shipments of subject plate.

The Commission responds that it considered the information provided by the German

Producers showing an increase in plate shipments to the German market and other EU markets

and found the increase to be, at best, incremental.[15] The German Producers argue that the

Commission has intentionally minimized the increases by analyzing the yearly average growth

rather than overall growth. The Commission, however, may choose to analyze the data as it sees

fit and the court finds no inherent error in analyzing the average yearly increase. Moreover, the

yearly average is consistent with the Commission's broader comparison of trends over the past

century. In order to understand the changes in the EU, the Commission has elected to take a

historical approach while the German Producers put forth a five-year snapshot. Reasonable

minds can differ as to which of the two is more accurate. The court finds that the Commission's

---

[15] In support, the Commission notes that, from 1990 to 1992, combined German plate shipments into the German markets and other EU countries averaged [    ] percent of total shipments compared to [    ] percent between 1993-99.

analysis is reasonable.

In addressing the German Producers' argument, the Commission cites data obtained from the World Trade Organization (WTO) pertaining to iron and steel trade from the EU as a whole showing that exports of these products by EU members outside of the EU have increased rather than decreased.[16]  The German Producers argue that analysis of this larger category of products is irrelevant to an investigation of CTL plate.  The Commission, however, is responding to Plaintiffs' argument that trade in general is increasing between EU members.  The Commission cites this evidence to contradict Plaintiffs' position that customs harmonization, the elimination of customs formalities, and the euro have made intra EU-trade more likely overall.

The Commission also points out that certain EU members are subject to antidumping and countervailing duty investigations in third countries despite changes in the EU.[17]  The Commission contends that the existence of some trade barriers, the cumulative increase in iron and steel exports outside the EU, and the "incremental" increase in intra-EU CTL plate shipments from Germany suggest that intra-EU trade is not as robust as Plaintiffs suggest.

The Commission also addresses the adoption of a single currency in the EU, finding that "it is too early to judge its probable effect on trade outside the EU, based on the record in these reviews."  Remand Determination at 23.  The Commission points out that the euro was adopted in January 1999 and that the period of review ("POR") extended only through March 2000.  The

---

[16]  The average ratio of these exports from the 15 EU members to each other rose from 0.446 between 1990-92 to 0.47 between 1996-98.  Domestic Producers Cold-Rolled Posthearing Brief, Exh. 2 at n.3.

[17]  Plate from Finland is subject to an ongoing investigation in Canada.  Plate from Spain is subject to antidumping and countervailing duty findings in Canada.  Final Determination at 27-28.

court agrees that there is insufficient data at present to explain the actual effects of the euro upon this review. Plaintiffs' arguments are largely theoretical – generally suggesting that the euro will increase trade because currency fluctuations will be eliminated. The Commission's position in the absence of data is reasonable at this point. The court acknowledges, however, that this will likely change as data becomes available. Future determinations may not rely upon this decision to discount the ongoing effect of a common currency.

The Commission's overall position seems to be that Plaintiffs have excess capacity to produce subject plate, the EU market has no demand for additional plate, and, therefore, it is more likely than not that the German Producers would utilize that excess capacity to ship product to the United States if the orders are revoked. The Commission does not dispute that changes in the EU may eventually increase subject imports within the EU, but points to the German Producers' Questionnaire Responses where they admit that, despite the harmonization of tariff laws, elimination of customs check-points, and overall stream-lining of trade in the EU since 1993, as well as the adoption of the euro, the German Producers themselves projected lower shipments of subject plate to other EU countries in 2000 and 2001 than in any year since 1994. Remand Determination at 24. While the court may not necessarily agree with each of the Commission's conclusions, the court finds that substantial evidence exists to support those conclusions and that the Commission has sufficiently considered the contrary evidence. As trade changes in the EU, however, the Commission's position should remain subject to reanalysis.

### 2. Likely Volume

While the Commission's findings regarding intra-EU trade may have support, finding that

EU countries are not dramatically increasing shipments within the EU is different from determining whether Germany and Belgium are likely to ship to the United States. In the course of its analysis, the Commission seems to put some burden on Plaintiffs to establish that these changes make imports unlikely. "[W]e do not find respondents' contention that developments in the EU since 1993 will deter member countries from shipping significant volumes of subject merchandise to the United States upon revocation of the orders to be persuasive." Remand Determination at 24. This is essentially a restatement of the Commission's position in the original determination that it was not "convinced that . . . exports to the United States [are] unlikely." Final Determination at 19. Plaintiffs argue that the Commission unduly shifts the burden to foreign producers. There is no statutory language expressly governing burden with respect to cumulation. As discussed, the Commission has elected to consider likely volume and its impact much as it does in the overall sunset review analysis.

19 U.S.C. § 1675a(a)(2) describes that analysis and generally provides that the Commission shall consider whether the likely volume of subject imports "would be significant if the order is revoked . . . either in absolute terms or relative to production or consumption in the United States." For purposes of determining whether the likely volume would be significant, the Commission "shall consider all relevant economic factors," including likely increases in production capacity or current unused capacity in the exporting country, barriers to importation of subject merchandise in other countries, and product-shifting potential in the exporting country. 19 U.S.C. §§ 1675a(a)(2)(A)-(D).

In discussing the overall sunset inquiry, the court has observed that "there is no presumption as to the likelihood of continuation or recurrence" of material injury in a sunset

review.  AG der Dillinger Huttenwerke v. United States, 193 F. Supp. 2d 1339, 1347 (Ct. Int'l

Trade 2002).[18]  The statute, however,  provides that the Commission shall consider the

determinations from its original investigation, including those regarding volume, in conducting

the related sunset review analysis.  See 19 U.S.C. § 1674a(1)(A).[19]  Because it is unknown what

the subject import volume would be in the absence of anti-dumping or countervailing duty

discipline, Congress has deemed it reasonable to consider the facts surrounding the initial

investigation in order to predict future trends.  This reliance upon the previous investigation

provides a portion of the factual support for a finding that future subject imports likely will recur

upon revocation.  The Commission's position here seems to be that, until respondents establish

that the conditions surrounding the original determination no longer exist, excess capacity

translates to a finding of future volume.  While the court finds the Commission's posture

somewhat troubling, there is some statutory support for that approach.[20]

    With respect to this sunset review, the Commission determined that the excess capacity of

each of the subject countries to produce all types of plate was substantial and that actual

---

[18]  The sunset cumulation statute seems to pull in two different directions.  The Commission must find competition likely in order to cumulate, but the anticumulation fact of no discernible impact is also subject to a likelihood test.  See 19 U.S.C. § 1675a(a)(7).

[19]  19 U.S.C. § 1674a(1)(A) provides, in relevant part that "[t]he Commission shall take into account– (A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued or the suspension agreement was accepted . . . ."  Id.  (emphasis added).

[20]  The court is not alone in its concerns or its view of the statute.  See, e.g., Michael O. Moore, Department of Commerce Administration of Antidumping Sunset Reviews: A First Assessment, Journal of World Trade 36(4):675-698 (2002) (concluding that the agencies' heavy reliance upon the initial determination, "while narrowly consistent with US law and congressional instructions," may not "[live] up to the spirit of [the United States'] commitments under the WTO's Anti-dumping Agreement.").

production of subject plate was significant. Final Determination at 30. In Usinor I, the court

found no error in the Commission's findings individually.[21] The court's concern was with the

Commission's conclusion that German and Belgian producers would likely use excess capacity

to produce CTL plate and export that plate to the United States. As discussed, the Commission

reasonably rejected Plaintiffs' argument that changes in the EU would preclude shipments to the

United States. As to Germany, the court finds that, because of the statutorily-approved reliance

upon the initial determination, the Commission's finding of likely volume, for the purposes of

determining whether there is no discernible impact, is supported by substantial evidence. With

respect to Belgium, the Commission must, on remand, recalculate its findings regarding capacity,

production, and export orientation without consideration of floor plate data and review its

conclusion as to likely Belgian volume.

### B.       Competition Overlap & Conditions of Competition

In Usinor I, the court found no error in the Commission's affirmative competition overlap

determination or consideration of conditions of competition, other than questioning whether the

Commission had applied the proper standard in light of Plaintiffs' arguments regarding the EU.

Slip Op. 02-39 at 14-16. In challenging these analyses after remand, the German Producers again

point to the creation of a European Single Market in the EU as making shipments of CTL plate to

the U.S. unlikely. As discussed, the court finds that the Commission's analysis of the changes in

the EU and rejection of Plaintiffs' argument are, at present, supported by substantial evidence.

As such, the court finds that the Commission did not err by cumulating Germany with the

---

[21] The calculation of Belgian capacity, production, and exports may require revision with the exclusion of floor plate.

remaining subject countries.

Duferco points out that the court inadvertently attributed [                    ] imports from non-subject countries to Usinor, and thus Belgium. Usinor I, Slip Op. 02-39, at 15 n.18. According to Usinor's Foreign Producer Questionnaire, Usinor had [    ] exports to the U.S. during the POR. Duferco argues that there may, therefore, be some confusion regarding likely overlap in the channels of distribution used by the Belgian producer. Defendant-Intervenors respond that the importer's data confirms the Commission's finding that both domestic producers and importers ship plate through similar channels of distribution. Final Determination at 32. This data relates only to channels of distribution used by importers. Because, under Duferco, there were [    ] subject imports, Duferco may be correct that there exists insufficient data regarding channels of distribution used by Belgian producers to support competition overlap. The Commission should revisit this issue upon remand. The court notes, however, that channels of distribution are one of several factors considered in deciding whether there is reasonable overlap of competition.

## IV.    Likely Continuation or Recurrence of Material Injury

### A.    Likely Volume

In determining whether revocation of an order would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time, the Commission analyzes the likely volume, price effect, and impact of subject imports on the domestic industry upon revocation. 19 U.S.C. § 1675a(1). In the Remand Determination, the Commission adopts its previous finding that the volume of cumulated subject imports likely would be significant within a reasonable foreseeable time if orders are revoked primarily because the combined capacity

greatly exceeds the volume of total subject imports in the 1993 investigations. Remand

Determination at 25.[22]  In Usinor I, the court found no error on this point "in isolation" but again

expressed concern over the Commission's reliance upon excess capacity in light of Plaintiffs'

arguments regarding the EU.  As discussed, the court finds no error in the Commission's reliance

upon the initial determination in light of the statute's requirement that it be considered.  In

addition, the court finds the Commission's explanation of its rejection of Plaintiffs' arguments

regarding the EU reasonable.[23]  On remand, however, the Commission must explain the effect of

Duferco, i.e. [                                    ] subject imports from Belgium, on its cumulated sunset

review analysis.

## V.       Discrepancies in Consumption Data

The final issue on remand involves the Commission's initial reliance upon a limited

number of questionnaire responses from domestic producers.  Usinor I, Slip Op. 02-39 at 24.

Plaintiffs argue that, as a result, the domestic industry under-reported capacity, production, and

shipment information.  As support, Plaintiffs pointed to significant differences between the

consumption data in this case and in Certain Cut-to-Length Plate from France (reporting almost

---

[22]  The Commission determined that, on a cumulative basis, the excess capacity of the subject countries greatly exceeds the volume of total subject imports in the total subject countries in the 1993 investigation.  In 1993, the cumulated volume of subject imports was 787,626 short tons.  See Staff Report at Table PLATE-I-1.  Cumulated capacity to produce subject plate in ten of the cumulated countries was 11.5 million short tons in 1999.  Excess subject capacity in that year was 1.8 million short tons.  See Staff Report at Tables PLATE-II-1, PLATE- IV-3-4, PLATE-IV-6-13.

[23]  In Usinor I, the court found no error in the Commission's analysis of the likely price effects and impact. Slip Op. 02-39 at 23-24.  The court noted that the Commission's impact determination heavily emphasized the weakened state of the domestic industry. Id.

1.5 million additional short tons in U.S. consumption). On remand, the Commission was instructed to address and explain these discrepancies.

In its remand determination, the Commission concedes that differences in the data exists but explains that in Plate from France, the Commission collected data from producers and importers of both carbon and microalloy CTL plate, as well as X-70 plate, because those products were within the scope of review. Neither microalloy plate or X-70 plate are included in the scope of these reviews. USITC Pub 3364 at 6-7. The court finds that the Commission has adequately explained the discrepancies and the differences in data.

### Conclusion

For the foregoing reasons, the court finds that Commission has adequately explained why it finds that recent changes in the EU would not preclude future shipments of subject plate. Based upon volumes originally found in the absence of antidumping discipline and the rejection of Plaintiffs' arguments regarding the EU, the court finds that the Commission's finding that future volume is likely is reasonable and supported by substantial evidence with respect to Germany. Consequently, the court finds that the Commission properly exercised its discretion to cumulate German imports with other subject imports. The court further finds that the Commission sufficiently explained the discrepancy in U.S. consumption figures.

Because of the CAFC ruling in Duferco with regard to Commerce's scope ruling, and not due to any error by the Commission, the court remands this matter so that the Commission can review the data without consideration of Belgian floor plate data. The Commission should either permit the Belgian producers to re-submit data to exclude floor plate information or explain how it can properly consider the information before it. On remand, the Commission should (1) reconsider whether Belgian imports should be cumulated with other subject imports; and (2) explain the impact of Duferco on its cumulated analysis. The United States International Trade Commission should consult with the parties and submit a proposed scheduling order within thirty (30) days explaining whether it will permit the Belgian producers to resubmit data and how much time the Commission will require to recalculate and reconsider the data.


_____
Jane A. Restani
JUDGE


Dated:  New York, New York

This 20th day of December, 2002