SLIP-OP 03 - 83

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| ANSHAN IRON & STEEL COMPANY, LTD., et al., | : | |
| Plaintiffs, | : | |
| v. | : | Before: Wallach, Judge |
| | : | Cons. Court No: 02-00088 |
| UNITED STATES OF AMERICA, | : | |
| Defendant, | : | |
| and | : | |
| BETHLEHEM STEEL CORPORATION, et al., and GALLATIN STEEL COMPANY, et al., | : | |
| Defendant-Intervenors. | : | |

[Motion for Judgment upon the Agency Record Denied. Commerce's Final Determination Affirmed in Part and Remanded in Part.]

Decided: July 16, 2003

Lafave & Sailer LLP (Francis J. Sailer), for Plaintiff Anshan Iron & Steel Co., Ltd. and Benxi Iron & Steel (Group) Co., Ltd.

White & Case LLP (William J. Clinton), for Plaintiff Shanghai Baosteel Group Corp., Baosteel America, Inc., and Baosteel Group International Trade Corp.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; Lucius B. Lau, Assistant Director; Stephen C. Tosini, Trial Attorney; Arthur D. Sidney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for Defendant.

Dewey Ballantine LLP (Bradford L. Ward), for Defendant-Intervenors Behtlehem Steel Corp.,

1

National Steel Corp. and United States Steel Corp.

Schagrin Associates (Roger B. Schagrin), for Defendant-Intervenors Gallatin Steel Co., IPSCO Steel Inc., Nucor Corp., Steel Dynamics, Inc. and Weirton Steel Corp.


**OPINION**


**Evan J. WALLACH, Judge.**


**I.**

**Introduction**


Plaintiffs Anshan Iron & Steel Company, Ltd., New Iron & Steel Company, Ltd. and Angang Group International Trade Corporation ("Plaintiff Anshan" or "Anshan"); Benxi Iron & Steel Company, Ltd., Benxi Steel Plate Company, Ltd., and Benxi Iron & Steel Group International Economic and Trade Company, Ltd. ("Plaintiff Benxi" or "Benxi"); and Shanghai Baosteel Group Corporation, Baosteel American, Inc., and Baosteel Group International Trade Corporation ("Plaintiff Baosteel" or "Baosteel") (collectively "Plaintiffs") move for judgment upon the agency record pursuant to USCIT Rule 56.2, challenging the decision of the United States Department of Commerce, International Trade Administration (the "Department," "Commerce" or "ITA") in Final Determination of Sales at Less Than Fair Value: Certain Hot Rolled Carbon Steel Flat Products from the People's Republic of China, 66 Fed. Reg. 49632 (Sept. 28, 2001) ("Final Determination") and the accompanying Issues and Decision

2

Memorandum for the Less than Fair Value Investigation of Certain Hot Rolled Carbon Steel Flat Products from the People's Republic of China: April 1, 2000 through September 30, 2000 (Sept. 21, 2000) ("Decision Memo"). Pub. Doc. 349, Appendix to Memorandum of Law in Support of Baosteel's Rule 56.2 Motion for Judgment Upon The Agency Record ("Baosteel App.") Attachment 4. Plaintiffs primarily contest Commerce's determination that proper valuation of Plaintiffs' factors of production necessitates the assignment of surrogate values to Plaintiffs' self-produced intermediate inputs rather than the assignment of factors of production for those inputs.

Plaintiffs also dispute additional aspects of the Final Determination, namely: (1) Commerce's alleged reliance on information outside the record; (2) Commerce's reliance on a single Indian company for purposes of deriving surrogate financial ratios; (3) Commerce's selection of surrogate values for steel scrap and iron ore; (4) Commerce's valuation of coking coal and Silicon Barium Strontium Aluminum; (5) Commerce's alleged failure to adjust Plaintiff Baosteel's factors of production for its defective hot-rolled sheets; and (6) Commerce's inclusion of factors of production for all of the producers in the Baosteel Group.

For the reasons set forth below, the Final Determination is affirmed in part and remanded in part.

## II.

### Background

Plaintiffs are producers and exporters of the subject merchandise, certain hot-rolled carbon steel flat products, from China. In the production of hot-rolled steel, Plaintiffs

3

incorporate purchased and self-produced inputs. Self-produced inputs include electricity generated from the processing of purchased coal, in addition to oxygen, nitrogen, and argon gases. These intermediate inputs are produced from purchased materials, including, inter alia, iron ore, scrap, coal, water, and various chemicals.

On February 26, 2001, Plaintiffs provided a factors of production database to the Commerce Department, in which they reported their consumption of coal and other material, energy, and labor factors used to produce the intermediate inputs. During on-site verification, Commerce verified the accuracy of the reported factors.

In Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products From the People's Republic of China, 66 Fed. Reg. 22,183 (May 3, 2001) ("Preliminary Determination"), Commerce did not include valuations for Plaintiffs' factors of production database, but rather assigned surrogate values to Plaintiffs' intermediary inputs. In order to calculate general expenses, Commerce used the average of two Indian steel producers' (Tata Iron and Steel Company, Ltd. ("TATA") and Steel Authority of India, Ltd. ("SAIL")) 1999-2000 financial statements. For profit, Commerce used information from TATA. Id. at 22,193.

In the Final Determination, Commerce continued to value plaintiffs' factors of production according to their intermediate inputs. As for general expenses and profit, Commerce relied solely on a 2000-2001 financial statement of TATA Steel instead of a combination of the two steel companies.

On October 15, 2001, and October 31, 2001, Plaintiffs Anshan, Benxi and Baosteel submitted letters to Commerce requesting an opportunity to comment on allegedly new

4

information referenced in Commerce's final determination. Commerce rejected and returned plaintiffs' letters on the ground that the letter contained untimely argumentation.

**III.**

**Jurisdiction and Standard of Review**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).

In reviewing the Final Determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1999). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F.Supp. 1375, 1380 (1993) (citing Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987)). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana, 10 CIT at 404-5.

## Analysis

### 1.

### Commerce's Valuation of Plaintiffs' Intermediate Inputs is Unsupported by the Evidence and Not in Accordance With Law

Plaintiffs claim Commerce incorrectly valued Plaintiffs' factors of production by assigning surrogate values to respondents' intermediate inputs instead of to the factors of production for those intermediate inputs. In the Final Determination, Commerce determined that it would continue "to value respondents' energy inputs (i.e., oxygen, argon, nitrogen, and electricity) through the use of surrogate valuation, rather than based on surrogate valuation of the factors going into the production of those inputs." Decision Memo at Comment 2. According to Plaintiffs: (1) Commerce deviated from its past practice without providing Plaintiffs an opportunity to comment on a new methodology for the valuation of intermediate inputs; and (2) Commerce's decision to assign surrogate values to intermediate inputs was unsupported by substantial evidence because the record contained verified factors of production for those intermediate inputs.

In valuing Plaintiffs' intermediate inputs, Commerce deviated from its well-established practice of assigning surrogate values to the factors of production for those intermediate inputs without providing an adequate explanation for such deviation. Commerce's failure to rely on Plaintiffs' submitted and verified factors of production is also inconsistent with the statute's directive to use the best available information to construct a nonmarket economy ("NME")

6

product's normal value as it would have been if the NME were a market economy country.

**a.**

**Commerce's Established Practice is to Value The Factors Of Production for Self-Produced Intermediate Inputs**

The antidumping statute provides that if subject merchandise is exported from an NME, and "the administering authority finds that available information does not permit the normal value of the subject merchandise to be determined," Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1) (1999). In valuing factors of production, Commerce is to "utilize, to the extent possible, the prices of costs of factors of production in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country, and . . . significant producers of comparable merchandise." Id. § 1677b(c)(4). Commerce must also value these factors of production "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."[1] Id. § 1677b(c)(1). While the statute does not define "best available information," it "grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 2001 CIT 96, 166 F. Supp. 2d 608, 616 (2001).

---

[1] 19 U.S.C. § 1677b(c)(3) provides that factors of production may include hours of labor required, quantities of raw materials employed, amounts of energy and other utilities consumed, and representative capital cost, including depreciation. 19 U.S.C. § 1677b(c)(3).

7

Although Commerce benefits from a certain amount of discretion, this court has consistently interpreted 19 U.S.C. § 1677b(c) to require determination of an NME product's normal value as it would have been if the NME were a market economy country. See Baoding Yude Chem. Indus. Co. v. United States, 170 F. Supp. 2d 1335, 1337 (2001); see also Nation Ford Chem. Co. v. United States, 21 CIT 1371, 1372, 985 F. Supp. 133, 134 (1997), *aff'd*, 166 F.3d 1373 (Fed. Cir. 1999). In valuing self-produced intermediate inputs, Commerce's normal practice has therefore been to calculate a respondent's self-produced intermediate inputs by assigning a surrogate value to the factors of production going into the production of those intermediate inputs.[2] In Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon Steel Plate from the People's Republic of China ("CTL Plate"), 62 Fed. Reg. 61,964 (Nov. 20, 1997), for instance, Commerce refused to disregard the reported and verified intermediate input factors of production that had been submitted by the respondents. Commerce said that:

> the value of the subject merchandise in this case is more accurately measured if the self-produced gases are valued based on the actual inputs used to make these gases. In NME cases, the Department selects the surrogate values that reflect best the costs that would have been incurred in producing the subject merchandise if the costs of such production had been determined by market forces.

---

[2] See CTL Plate, 62 Fed. Reg. 61,964, 61,966 (Nov. 20, 1997); Final Determination of Sales at Less Than Fair Value: Coumarin From the People's Republic of China, 59 Fed. Reg. 66,895, 66,899 (Dec. 28, 1994) (stating that "under section 773 of the Act it is appropriate to value all of the factors or production, including intermediate inputs captively-produced by the responding producer," and that "this methodology is consistent with Department practice in NME cases"); Silicomanganese From the People's Republic of China: Notice of Final Results of Antidumping Duty Administrative Review, 65 Fed. Reg. 31,514, 31,515 (May 18, 2000) and accompanying Issues and Decision Memorandum (May 18, 2000) (the Department's "established practice" is to "valu[e] self-produced inputs using the value of the materials, energy and labor employed to manufacture the input").

Id. at 61,976, Decision Memorandum at Comment 11. Commerce went on to summarize its

practice as follows:

> It is the Department's practice to collect data on all direct inputs actually
> used to produce the subject merchandise, *including any indirect inputs*
> *used in the in-house production of any direct input.*

Id. (emphasis added). Commerce's practice is based on a statutory mandate to accurately

estimate the actual experiences of an NME respondent as if it were a market economy.

Defendant-Intervenors Bethlehem claim that the statute requires Commerce "to build[] up

its factors of production based on the quantities of the inputs used, not on the upstream costs

associated with the production of those inputs." See Memorandum of Defendant-Intervenors

Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation In

Response to Plaintiffs' Motions For Judgment On The Agency Record ("Bethlehem Memo") at

12. According to Bethlehem, "regardless of whether an NME producer of the subject

merchandise purchases or produces the inputs, the Department, in calculating normal value,

utilizes the quantities of the inputs actually consumed by the NME producer in the production of

the subject merchandise." Id. Both Defendant and Defendant-Intervenors claim this practice has

been established by Commerce in Freshwater Crawfish Tail Meat from the People's Republic of

China: Final Results of Administrative Antidumping Duty and New Shipper Reviews, and Final

Rescission of New Shipper Review, 65 Fed. Reg. 20,948 (Apr. 19, 2000) ("Crawfish from the

PRC"), and Final Determination of Sales at Less Than Fair Value: Foundry Coke Products from

the People's Republic of China, 66 Fed. Reg. 39,487 (July 31, 2001) ("Foundry Coke from the

9

PRC"), and affirmed by this court in <u>Pacific Giant, Inc. v. United States</u>, 223 F. Supp. 2d 1336 (2002).[3]

Although <u>Pacific Giant</u> dealt with the proper valuation of factors of production, the facts and holding of the case fail to address the proper valuation of self-produced intermediate inputs. There, Chinese crawfish producers argued Commerce should not assign any value to the water consumed during crawfish tailmeat production. <u>Pac. Giant</u>, 223 F. Supp. 2d at 1346. Because no cost was incurred for the water, the producers maintained Commerce should instead assign a value to the electricity used to pump water from their wells. <u>Id.</u> In response, Commerce argued that (1) water was a factor of production even though no cost was associated with its use, and (2) no record evidence existed that electricity costs for pumping water had been reported to Commerce. <u>Id.</u> The court never discussed electricity as a factor of production for water consumption, nor did it weigh the importance of valuing one over the other. The central issue was not whether water should be valued as an intermediate input, but rather whether water is a factor of production even though no cost is associated with its usage. <u>Id.</u>

Similarly, in <u>Crawfish from the PRC</u>, a crawfish producer argued that no value should be assigned to raw crawfish because it was not a factor of production. <u>Crawfish from the PRC</u>, 65 Fed. Reg. 20,948, and accompanying Issues and Decision Memorandum at Comment 27. The

_____

[3] Defendant-Intervenors also cite to <u>Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams From the People's Republic of China</u> , 67 Fed. Reg. 35,479 (May 20, 2002), <u>Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products From the People's Republic of China</u>, 67 Fed. Reg. 31,235 (May 9, 2002), and <u>Notice of Final Determination of Sales at Less Than Fair Value: Carbon and Certain Alloy Steel Wire Rod From Ukraine</u>, 67 Fed. Reg. 55,785 (Aug. 30, 2002), as evidence of Commerce's past practice. These determinations, however, were based on the final determination under review in the present case.

producer maintained that because it collected live crawfish using company-employed laborers, only the labor cost should be a relevant factor of production. The Department held that it is the quantities of inputs that is relevant, and not the costs associated with those inputs. Id. Commerce reasoned that since raw crawfish was a factor of production, the fact that it was purchased or collected became irrelevant.

Commerce, however, never considered live crawfish an intermediate input. On the contrary, Commerce emphasized the primary nature of the input at issue (i.e., crawfish), stating that "whether [respondent] purchased or collected crawfish, the Department still utilizes the quantities of *raw materials* employed during its calculation of constructed value." Id. (emphasis added). Commerce was thus not faced with the issue of determining whether a self-produced intermediate input should be valued based upon its factors of production.

Foundry Coke from the PRC similarly does not support Defendant and Defendant-Intervenor Bethlehem's position. In Foundry Coke from the PRC, respondents argued that coal purchased from affiliates should be treated as a self-produced input and that surrogate values should be assigned to the actual inputs used to produce the coal (i.e., the intermediate input). Foundry Coke from the PRC, 66 Fed. Reg. 39,487, and accompanying Issues and Decision Memorandum at Comment 3. Commerce simply concluded that "[b]ased on the record facts, we do not consider that coal is a self-produced input for any of the respondents. . . . Therefore, we did not value coal using the factors of production for coal from the coal mines." Id. This court subsequently remanded the issue in CITIC Trading Co. v. United States, Slip Op. 03-23, 2003 Ct. Int'l Trade LEXIS 33 (Mar. 4, 2003), holding that Commerce had failed to adequately explain why it did not consider respondents' coal a self-produced input. The court specifically concluded

11

that "a remand is necessary so that Commerce may properly determine whether applying a factors of production methodology to the coal produced by the related coal mines is appropriate." Id. at 32-33, 2003 Ct. Intl. Trade LEXIS at 48. The key issue therefore was not whether coal should be valued as an intermediate input, but rather whether coal was or was not a self-produced input.

Defendant-Intervenors Gallatin further claim that 19 U.S.C. § 1677b(c) vests Commerce with broad discretion in constructing normal values in nonmarket economy cases. See Memorandum of Gallatin Steel Co.; IPSCO Steel Inc.; Nucor Corporation; Steel Dynamics, Inc.; and Weirton Steel Corporation in Response to Plaintiffs' Rule 56.2 Motions For Judgment On The Agency Record ("Gallatin Memo") at 7. According to Defendant-Intervenors Gallatin, "[s]ince the statute does not specify what constitutes best available information, these decisions are largely within Commerce's discretion." Gallatin Memo at 7-8. However, none of the cases cited by Defendant-Intervenors Gallatin address Commerce's discretion in deciding whether to value a respondent's factors of production for self-produced intermediate inputs.[4] As Plaintiff Baosteel correctly points out, the issue here is not about the best values for Plaintiffs' intermediate inputs, but rather, the selection of appropriate factors for valuation. See Reply in Support Of Plaintiff Baosteel's CIT Rule 56.2 Motion For Judgment Upon The Agency Record ("Baosteel's Reply") at 8.

---

[4] See, e.g., Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 ("While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines."); Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 23 CIT 479, 481, 59 F. Supp. 2d 1354, 1357 ("[T]he very structure of the statute suggests Congress intended to vest discretion in Commerce by providing only a framework within which to work."); Olympia Indus. v. United States, 7 F. Supp. 2d 997, 1000 (CIT 1998) ("The relevant statute . . . does not clearly delineate how Commerce should determine what constitutes the best available information.").

12

Defendant and Defendant-Intervenors have failed to provide any authority supporting the proposition that Commerce's established practice is to value self-produced intermediate inputs based on the intermediate inputs' value. In light of CTL Plate and Commerce's practice of valuing the factors of production of self-produced intermediate inputs, analysis must turn to whether Commerce provided an adequate explanation for its departure from well-established practice.

**b.**

**Commerce's Reasoning For its Change Of Practice is Unsupported by the Evidence and Not in Accordance With Law**

Commerce is generally at liberty to discard one methodology in favor of another where necessary to calculate a more accurate dumping margin, subject to two important restrictions. Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 178 F. Supp. 2d 1305, 1327 (CIT 2001). First, Commerce may not alter its methodology where a respondent has detrimentally relied on an old methodology used in previous reviews. See, e.g., Shikoku Chems. Corp. v. United States, 16 CIT 382, 388-389, 795 F. Supp. 417 (1992). Second, Commerce must explain the basis for its change of methodology and demonstrate that its explanation is in accordance with law and supported by substantial evidence. Cultivos Miramonte S.A. v. United States, 21 CIT 1059, 1064, 980 F. Supp. 1268, 1274 (1997); Fujian Mach., 178 F. Supp. 2d at 1327-28. Pursuant to 19 U.S.C. § 1677m(g), Commerce must also provide the parties affected by the change a final opportunity to comment before the Final Determination. 19 U.S.C. § 1677m(g)(1999).

13

In this case, Commerce provided several reasons for its decision to assign surrogate values to Plaintiffs' intermediate inputs instead of the factors going into the production of those inputs. First, Commerce reasoned that the use of Plaintiffs' factors of production data would result in a mathematically incorrect result. Decision Memo at Comment 2. For purposes of surrogate value calculations, Commerce relied on the financial statements of only one surrogate producer: TATA. According to Commerce, TATA purchased energy, and "[t]his purchased power, which is included in the amount for materials, labor, and energy, is a fully loaded cost." Id. Commerce therefore concluded that "[b]ecause respondents are self-producing some or all of their energy, by applying a financial ratio which includes in its denominator fully loaded energy costs to factors which contain a small portion, if any, of respondents' energy costs, the Department would be understating normal value." Id.

Commerce also reasoned that Plaintiffs' "self generation of the energy inputs in question (i.e., electricity, argon, oxygen, and nitrogen) is a heavily capital intensive process." Id. According to Commerce, Plaintiffs' capital intensive process would result in further inaccuracies because these "capital costs . . . do not appear on TATA's financial statements and would not be included in the normal value under respondents' preferred methodology." Id.

Finally, Commerce explained that, apart from mathematical inaccuracies, Plaintiffs' preferred methodology would require Commerce "to conduct in essence two investigations, one into the production of the subject merchandise and another into the production of the inputs into certain factors." Id. Implicit in this statement is Commerce's conclusion that conducting two investigations would be excessive and unnecessary.

Both Defendant and Defendant-Intervenor Bethlehem claim Commerce's reasoning is

14

supported by substantial evidence. According to Bethlehem, it is the consumption of inputs and not the purchase or production of inputs that is of importance when assigning surrogate values. Bethlehem Memo at 12. Bethlehem argues that if Commerce were to follow Plaintiffs' methodologies, it would result in mathematical inaccuracies because financial ratios including all the costs of production (i.e., depreciation, financial expense, etc.) would be applied to factors of production including no costs of production. In other words, it would result in an understatement of normal value because the financial ratio's denominator would be inflated in comparison to Plaintiffs' factors of production.[5] Id. at 19-20. Bethlehem further argues that focusing on "upstream" inputs would, as explained by Commerce in the Final Determination, result in a needless expansion of Commerce's factors of production analysis. Id. at 21.

As Plaintiffs correctly point out, however, Commerce's conclusion is entirely based on its capital valuation of Plaintiffs' and TATA's electrical and gas production facilities. See Brief of Plaintiffs in Support of Rule 56.2 Motion ("Anshan Brief"); Memorandum of Law in Support of Baosteel's Rule 56.2 Motion for Judgment Upon the Agency Record ("Baosteel Memo") at 25. According to Commerce, Plaintiffs' self-generation of energy inputs is "capital intensive," whereas TATA's is not because it purchases its energy. Decision Memorandum at Comment 2. Commerce simply bases this conclusion on one line in TATA's financial statements indicating that it purchases power. Id. The fact that TATA purchases power, however, does not negate the

---

[5] Financial ratios are used to determine overhead, financial and selling, general and administrative factors ("E"). The denominator consists of the surrogate's material, labor, and energy costs ("Y"). Consequently, if $(1/Y \times (\text{surrogate value})) = E$, and $(E + (\text{surrogate value})) =$ normal value ("NV"), then the greater Y is, the smaller NV becomes.

possibility that it produces power as well.[6] In fact, as Plaintiff Anshan points out, the same

excerpts of TATA's financial statements supporting Commerce's "purchase of power"

conclusion also seem to indicate that TATA derived a certain amount of income from the "Sale

of power and water." See Anshan Brief at 20; Petitioners' Surrogate Value Submission, June 19,

2001, page 32, reprinted in Appendix of Public Documents Cited in Brief of Plaintiffs in Support

of Rule 56.2 Motion Part B ("Anshan App. Part B"), AR282. Nowhere in the Final

Determination does Commerce address the issue, nor does it provide any further explanation as

to its rationale that a company's purchase of power excludes the possibility of its production.

Indeed, Commerce acknowledged TATA's electricity production capabilities in a recent

determination.[7] See Notice of Preliminary Determination of Sales at Less Than Fair Value:

Certain Cold-Rolled Carbon Steel Flat Products From the People's Republic of China, 67 Fed.

Reg. 31,235, 31,239 (May 9, 2002) ("Cold-Rolled Carbon Steel"). In Cold-Rolled Carbon Steel,

Commerce stated:

> In this case, as explained below, to value overhead, selling general and
> administrative ("SG&A"), interest, and profit, we are relying on the 2000-
> 2001 financial statements of Steel Authority of India Limited ("SAIL")
> and TATA Steel ("TATA"), both of whom are Indian integrated steel
> producers of cold-rolled steel. The financial statements of both companies
> . . . indicate that during the 2000-2001 financial year SAIL and TATA self

---

[6] For instance, Plaintiff Baosteel both produced and purchased electricity during the period of investigation. See Baosteel's Brief at 25; see also Baosteel's February 26, 2002 Section D response, at D-13, Baosteel App., Attachment 8.

[7] Although Commerce issued this determination subsequent to the determination under review in the present case, this court may take judicial notice of subsequent events that are properly brought before the court's attention. See Borlem S.A. - Empreedimentos Industriais v. United States, 913 F.2d 933, 937 (Fed. Cir. 1990) (noting that deference is not owed to a determination that is based on data that the agency generating those data indicates are incorrect), cited in Union Camp Corp. v. United States, 23 CIT 264, 53 F. Supp. 2d 1310, 1325 (1999).

produced approximately 60 and 54 percent, respectively, of the electricity they consumed.

Id. Commerce's decision in the present case therefore directly contradicts its previous acknowledgment that, during the year in question, TATA produced a significant amount of the electricity it consumed.

Even if TATA did not produce power, no implication would arise regarding its use of oxygen, argon, and nitrogen. Commerce fails to provide any explanation as to why TATA would treat such elemental gases as power inputs, nor how they could be used to "produce power." As stated by Plaintiff Baosteel, "[i]t is general knowledge, especially to Commerce, which has conducted hundreds of investigations and administrative reviews involving steel products, that oxygen facilitates burning in the blast furnace, nitrogen helps to anneal steel, and argon is used to flush molten metal to remove dissolved gases." Baosteel Memo at 31. Consequently, even if Commerce's conclusion regarding TATA's purchase of power were supported by substantial evidence, it would remain inapplicable to TATA's oxygen, argon, and nitrogen production capacity.

Commerce's additional explanation that Plaintiffs' methodology would require it to conduct two investigations (i.e., one into the production of subject merchandise and another into the production of the inputs into certain factors) is similarly unsupported by substantial evidence and contrary to statutory authority. The record in the present case contained complete and verified factors of production for electricity and industrial gases.[8] Moreover, the alleged

---

[8] See e.g., Angang Verification Report at 9, 11 and Verification Exhibits 12 (gases) and 13 (electricity); and Benxi Verification Report at 8, 9 and Verification Exhibits 11 (electricity) and 13 (gases (oxygen)), reprinted in Appendix of Business Proprietary Documents Cited in

17

difficulty of determining factors of production for intermediate inputs stands in sharp contrast to Commerce's treatment of other intermediate inputs in the present case. See Baosteel's Reply at 5; see also Baosteel's February 26, 2001 Section D response, Baosteel App. at Attachment 8. Commerce has therefore failed to provide any evidence that this alleged difficulty in conducting an investigation into a respondent's factors of production for self-produced intermediate inputs is any more complex than any other factors of production analysis conducted in previous investigations. Commerce's rationale would unfairly disadvantage any NME producer wishing to produce its own inputs. This conclusion is contrary to the statute's directive to use the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1).

On this basis, this court finds that Commerce's decision to assign surrogate values to Plaintiffs' intermediate inputs constitutes a deviation from its established practice to value the factors of production of self-produced intermediate inputs. Commerce has failed to provide an adequate explanation, supported by substantial evidence and in accordance with law, for its deviation from established practice. A remand is necessary so that Commerce may either (1) provide an adequate explanation for its deviation from previous practice, or (2) assign surrogate values to Plaintiffs' factors of production for its self-produced intermediate inputs.[9]

---

Brief of Plaintiffs in Support of Rule 56.2 Motion Part A ("Anshan App. Part A"); see also Baosteel Verification Report at 17-18, Baosteel App. at Attachment 9.

[9] Because Commerce's decision to value Plaintiffs' intermediate input was not supported by substantial evidence, this court will not examine Plaintiffs' additional claim that Commerce relied on information outside of the record without providing Plaintiffs an opportunity to comment upon such evidence.

**2.**

**Commerce Properly Exercised its Discretionary Judgment in Choosing to Rely on the TATA 2000-2001 Financial Statements To Derive Plaintiffs' Surrogate Financial Ratios**

As previously discussed, Commerce must value a respondent's factors of production "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." Id. The NME regulations provide that for "manufacturing overhead, general expenses, and profit . . . the [Department] normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country." 19 C.F.R. §351.408(c)(4). In selecting surrogate values, "the statute grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 201 F. Supp. 2d 1316, 1319 (CIT 2002).

In the Preliminary Determination, Commerce relied on the 1999-2000 financial statements of two Indian steel manufacturers: SAIL and TATA. In the final determination, however, Commerce relied solely on a 2000-2001 TATA annual report submitted by petitioners subsequent to the preliminary determination. Commerce explained:

> There are several factors concerning SAIL's 1999-2000 financial statements which, when considered together, lead to a determination that they are not an appropriate basis on which to value surrogate overhead, SG&A, and profit. SAIL's 1999-2000 financial statements are not contemporaneous with the POI, SAIL did not make a profit in fiscal year 1999-2000, and SAIL embarked on a substantial government sanctioned financial and business restructuring plan during fiscal year 1999-2000, which envisaged the waiver of loans, write-down of assets, and government subsidies.

19

Decision Memo at Comment 4.

Plaintiffs claim Commerce improperly excluded the 1999-2000 SAIL financial account from its surrogate financial ratio calculations. According to Anshan,"[c]ombining SAIL's and Tata's financial experience provides a much better chance that the Department's financial ratios will not be aberrational and improper." Anshan Brief at 28. Although Plaintiffs concede that the 2000-2001 TATA accounts are more contemporaneous to the POI, Plaintiffs claim that it is Commerce's practice to emphasize representativeness over contemporaneity. According to Plaintiffs, it is Commerce's long-standing practice to base surrogate values on multiple producers even if it means resorting to less contemporaneous financial data. Baosteel Memo at 40.

Plaintiff Baosteel further disputes Commerce's conclusion that subsidized and unprofitable surrogate producers are not representative of the surrogate industry. According to Baosteel, it was improper for Commerce to base its exclusion of the SAIL account based on unprofitability because "the largest segment of the domestic industry in fact was not profitable." Id. at 41. Plaintiff Baosteel further maintains that Commerce's exclusion of SAIL based on subsidization was arbitrary and inconsistent with Commerce's use of the same account in previous investigations. Id. at 43.

As Defendant correctly points out, however, Commerce has broad discretion to determine what is best available information for its surrogate value calculations. Defendant's Memorandum In Opposition To Plaintiffs' Motions For Judgment Upon The Agency Record ("Defendant's Memo") at 22-23 (citing Timken Co., 201 F. Supp. 2d at 1319). In this case, Commerce determined that the 2000-2001 TATA account was best available information because it was (1) contemporaneous to the period of investigation, and (2) more representative of

the surrogate industry than the 1999-2000 SAIL account.  Decision Memo at Comment 4.

Although 19 U.S.C. § 1677b(c) fails to indicate the time periods from which surrogate values are supposed to be taken, this court has repeatedly recognized that Commerce's practice is to use surrogate prices from a period contemporaneous with the period of investigation.[10] Accordingly, Commerce's decision to rely on the 2000-2001 TATA accounts was not arbitrary, as Plaintiffs claim, but rather based on a long-standing practice to provide an accurate surrogate for nonmarket economy prices.

Although Commerce should not sacrifice representativeness for contemporaneity, Commerce did not base its exclusion of the SAIL account solely on the contemporaneity of TATA's surrogate values.[11]  Commerce examined contemporaneity in combination with the financial experience of SAIL in 1999-2000, and only then concluded that TATA's 2000-2001 statements would be more appropriate and accurate.  Decision Memo at Comment 4.  This decision was based on SAIL's lack of profitability, a "substantial government sanctioned financial and business restructuing plan," and SAIL's receipt of government subsidies.  Id.  After considering these factors in toto, Commerce concluded that SAIL's account should be excluded. Commerce was never constrained to rely on multiple producers nor was it constrained to

---

[10] See Shandong Huarong Gen. Corp. v. United States, 159 F. Supp. 2d 714, 728 (CIT 2001); Coalition for the Pres. of Am. Brakedrum and Rotor Aftermarket Mfrs. v. United States, 23 CIT 88, 44 F. Supp. 2d 229, 259 (1999) ("Commerce's practice is to use publicly available values which are 'representative of a range of prices within the [period of investigation],'" quoting Union Camp Corp. v. United States, 20 CIT 931, 941 F. Supp. 108, 116 (1996)).

[11] One should not be mutually exclusive of the other.  If Commerce, and this court, emphasize the importance of contemporaneity, it is to achieve greater representativeness.

21

consider an unprofitable company representative of the Indian surrogate industry as a whole.[12]

Plaintiff Anshan further disputes Commerce's inclusion of the TATA 2000-2001 accounts because petitioners submitted the account subsequent to the preliminary determination. Brief of Plaintiffs in Support of Rule 56.2 Motion ("Anshan Brief") at 29. Plaintiffs, however, had ample opportunity to comment or supplement petitioner's submission of the 2000-2001 TATA accounts. The Department's regulation provided them with up to ten days from service "to rebut, clarify or correct" factual information submitted by any other party. 19 C.F.R. § 351.301(c). Plaintiff's suggestion that the Department should have asked for additional information would essentially shift or remove Plaintiffs' burden of developing the record through submission of factual information. If Plaintiffs were under the belief that SAIL's 2000-2001 accounts would have provided Commerce with a more representative and accurate description of the Indian surrogate industry, they should have submitted this information. Because Plaintiffs never submitted this information, Commerce properly exercised its discretion in choosing the best available information on the record to derive its surrogate financial ratios.

Accordingly, use of TATA's 2000-2001 statements to derive surrogate financial ratios

---

[12] See, e.g., Pure Magnesium From the People's Republic of China: Final Results of Antidumping Duty New Shipper Administrative Review, 63 Fed. Reg. 3085, 3088 (Jan. 21, 1998) (noting that use of a financial report of a single Indian producer to value factory overhead, SG&A, and profit, is more appropriate even though other data is available); Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 33320, 33349 (June 18, 1998) (holding that even though two financial statements for calculating factor overhead, SG&A, and profit were available, use of just a single financial statement is more appropriate because of contemporaneity with the POR); see also Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Carbon and Certain Alloy Steel Wire Rod From Ukraine, 67 Fed. Reg. 17,367, 17,373 (Apr. 10, 2002).

was reasonable.

**3.**

**Commerce's Valuation of Steel Scrap Was Reasonably Valued Based on A Source From The Surrogate Country**

In the Final Determination, Commerce derived a value for steel scrap of $146.54 per metric ton based on data derived from the Monthly Statistics of the Foreign Trade of India ("MSFT"). Decision Memo at Comment 13. Plaintiffs Anshan and Benxi claim this value is aberrational in comparison to world market prices of steel scrap which, during the POI, ranged from $86.50 to $110. Anshan Brief at 34. To support this contention, Plaintiffs cite to average prices for steel scrap quoted in American Metal Market and Metal Bulletin, two publications based on American and European prices. Id.

While Plaintiffs may have only demonstrated that there is a noticeable difference in steel scrap prices among the American, European, and Indian markets, they have not shown that the Indian price is aberrational in comparison to other Indian prices, or to prices from other countries of similar economic development to China. Nor have Plaintiffs demonstrated that American and European prices are a reliable benchmark of comparison to Indian prices.[13] The antidumping statute provides that Commerce must value a respondent's factors of production based on the best available information in a market that is of comparable economic development to the nonmarket economy country. 19 U.S.C. §§ 1677b(c)(1), 1677b(c)(4). Plaintiffs are essentially

---

[13] Plaintiffs might have shown that the global market price for scrap steel was, in fact, the price normally paid in comparable market economies. They failed to do so.

citing to prices reported from the United States and the Netherlands, countries that are certainly not at a level of development similar to China. See Decision Memo at Comment 13.

As Defendant-Intervenors correctly point out, Commerce based its surrogate value for steel scrap on "a publicly available source from the primary surrogate country that was contemporaneous with the POI and specific to the input at issue." Bethlehem Memo at 43. Accordingly, Commerce properly exercised its discretion to select best available information from a market that is of comparable economic development to China.

## 4.

### Commerce's Valuation of Iron Ore Was Reasonably Based on an Average of World Prices for Iron Ore Imports into India

In the Final Determination, Commerce valued Plaintiff Anshan and Benxi's iron ore supplied locally based on an Indian surrogate value derived from MSFT data. Final Determination, Decision Memo at Comment 15. Plaintiff Anshan claims Commerce improperly valued its iron ore because it valued low-grade domestic ore at a higher price than high grade imported Indian and Australian ore. Anshan Brief at 37. According to Anshan, Commerce should have treated Plaintiffs' Australian ore prices as a "cap" on domestic prices "since it is unthinkable that the Plaintiff companies would pay more for low-grade domestic product than for superior imported product." Id. at 38. To support this contention, Plaintiffs cite to section 351.408 of the Department's regulations, which states that:

> [W]here a factor is purchased from a market economy supplier and paid for in a
> market economy currency, the Secretary normally will use the price paid to the

market economy supplier. In those instances where a portion of the factor is purchased from a market economy supplier and the remainder from a nonmarket economy supplier, the Secretary normally will value the factor using the price paid to the market economy supplier.

19 C.F.R. § 351.408(c)(1); Anshan Brief at 38.

Plaintiffs, however, have failed to establish that Commerce's choice of surrogate values for domestic ore is aberrational. As Anshan itself acknowledges, the majority of its iron ore is supplied from within China, whereas a relatively small amount of ore is imported from Australia and India. Anshan Brief at 37. Commerce exercised its discretion in choosing to rely on an average of world prices for iron ore imports into India. As stated by Commerce:

> The surrogate value for iron ore from MFST is preferable to a single Australian price because the MFST value is based on an average of world prices for iron ore imports into India from the POI. By contrast, the Australian price is based on a single spot price from one country. Therefore, we have continued to use the iron ore value from MFST for the final determination.

Decision Memo at Comment 15 (internal citations omitted). Plaintiffs claim Defendant and Defendant-Intervenors fail to address Commerce's regulation 19 C.F.R. § 351.408, and the requirement of a "cap" on domestic iron ore valuation. Reply Brief In Support of Motion of Plaintiffs Anshan and Benxi For Judgment On The Agency Record Pursuant to Rule 56.2 ("Anshan Reply") at 10. Plaintiffs, however, already raised the argument in the investigation below, and Commerce provided the following answer:

> [W]e agree with Petitioners . . . that it is the Department's standard practice with respect to market economy purchased inputs to ignore small-quantity purchases because the size of the purchases could result in aberrational values.

25

Decision Memo at Comment 15. Contrary to Plaintiffs' assertions, the language of 19 C.F.R. § 351.408 does not restrict Commerce's broad discretion to determine best information available when choosing surrogate values. 19 C.F.R. § 351.408 provides that Commerce "*normally* will value the factor using the price paid to the market economy supplier." 19 CFR § 351.408 (emphasis added). This language merely suggests a particular methodology, but does not impose upon Commerce the requirement of selecting the market economy price of a respondent's purchases to the exclusion of more appropriate values.

In the present case, Commerce chose the MSFT values because it determined that Plaintiffs' imports of iron ore were too minimal to provide an adequate surrogate value for its substantial domestic purchases. Accordingly, Commerce's valuation of Plaintiffs' iron ore was supported by substantial evidence and in accordance with law.

**5.**

**Commerce Reasonably Valued Plaintiffs' Coking Coal According to Use Rather Than Type**

Commerce derived a value for Plaintiffs' coal based on coking coke data from the MSFT. Decision Memo at Comment 12. Plaintiff Anshan claims that Commerce, instead of relying solely on coking coal values, should have used a blend of coking coal and less expensive coal values. Anshan Brief at 42-43. According to Plaintiffs, there are five different types of coal used in their coke-making process, with only [ %] of "rich coal" falling within the higher grade coking coal category. Id. at 44.

As Defendant-Intervenors correctly point out, however, Plaintiffs have failed to establish

26

that Commerce's valuation of coking coal was unreasonable. Bethlehem Brief at 46-47.

Commerce noted that the MSFT provides three classifications of coal according to use:

> The Monthly Statistics of the Foreign Trade of Indian ("MSFT"), the source of the surrogate value data, are clearly labeled in such a manner as to separate values for coal according to use rather than type as asserted by Angang. There are three broad classifications: steam coal (i.e., coal used to generate steam for heating and power generation purposes), coking coal (i.e., coal used to create coke), and other coal (i.e., coal used for some other purpose) . . . Therefore, the Department has determined that coal used in the coking stage will be valued at the coking coal surrogate value . . . In other stages, where Benxi and Angang labeled an input as "coal," it will be given the surrogate value for "other coal."

Decision Memo at Comment 12. Although Anshan maintains that it uses different grades of coal for coke-making, they have failed to establish that Commerce's decision to value coal used for coke-making as "coking coal" was unreasonable. The record does contain Plaintiffs' submissions that their coal is divided into five different types of coal. Anshan Verification Report Exhibit 5-A (AR 381) reprinted in Appendix of Business Proprietary Documents Cited in Brief of Plaintiffs in Support of Rule 56.2 Motion Part A ("Anshan App. Part A"). Plaintiffs, however, have failed to establish that Commerce should have valued only "rich coal" as coking coal, when all of the five categories of coal are used in the coke-making process,[14] or that the

_____

[14] Moreover, Commerce properly rejected Plaintiffs' additional submissions as they were submitted more than a week after the 19 C.F.R. § 351.301(b)(1) deadline for submission of unsolicited factual information. See Memorandum from Catherine Bertrand through James doyle to Edward C. Yang re: Verification of Sales and Factors of Production for Angang Group International Trade Co. Ltd., New Iron & Steel Co., Ltd., Angang Group Hong Kong Co., Ltd. ("Angang") in the Antidumping Duty Investigation of Hot-Rolled Carbon Steel Flat Products from the People's Republic of China (June 28, 2002), P.R. Doc 198, Appendix to Memorandum of Defendant-Intervenors Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation in Response to Plaintiffs' Motions for Judgment in the Agency Record ("Bethlehem App."), Doc. 13, at 2-3.

Indian surrogate's broad categorization of "coking coal" excludes Plaintiffs' "lesser" grades of coal.[15]

Commerce's decision was therefore an exercise of its discretionary judgment to value Plaintiffs' factors of production based upon the best available information in the primary surrogate country. Accordingly, Commerce's decision was in accordance with law and supported by substantial evidence.

## 6.

### Commerce Correctly Calculated Plaintiff Benxi's Factors for Silicon Barium Strontium Aluminum

During the investigation below, Plaintiff Anshan identified its use of a product combination called Silicon Barium Strontium Aluminum Calcium ("SBSAC"). Plaintiff Benxi, however, identified its use of a product combination called Silicon Barium Strontium Aluminum. Plaintiffs claim these product combinations are the same, but were mistakenly identified by Plaintiff Benxi without the last chemical compound of Calcium. Anshan Brief at 44-45. In the Final Determination, Commerce valued Plaintiff Anshan's SBSAC based upon the proportion of each element reported to Commerce, whereas for Plaintiff Benxi, Commerce used a simple average of the import values for each constituent element. Decision Memo at Comment 14. In

---

[15] There is also no evidence on the record suggesting that MSFT's broad classifications of coal are unique or unusual. On the contrary, coking coke is classified within the Harmonized Tariff Schedule of the United States ("HTSUS") 2704.00.00 under the general description of "[c]oke larger than 100 mm (4 inches) in maximum diameter and at least 50 percent of which is retained on a 100-mm (4-inch) sieve after drop shatter testing pursuant to ASTM D 3038, of a kind used in foundries."

addressing Plaintiff Benxi's submissions, Commerce stated:

> For Benxi, we do not have information regarding the chemical content of the input at issue. We disagree with Benxi that we should apply Angang's reported formula to value Benxi's input containing strontium because it is unclear whether Benxi and Angang used the same input. Benxi identified the input as silicon barium strontium aluminum, whereas Angang identified the input as silicon barium strontium aluminum calcium . . . Thus, the difference in the names of the inputs implies that Benxi and Angang used different inputs. In addition, there is insufficient information regarding the use of this input to ascertain whether Benxi and Angang used the same input.

Id.

Plaintiff Anshan argues that Commerce improperly "assumed that each of the four elements in the Benxi name of the product was present equally in the product at Benxi for valuation purposes." Anshan Brief at 45. According to Anshan, it "was an unnecessary profession of ignorance" for Commerce to "allocate[] the cost [of] 25 percent to each." Id. As Defendant correctly points out, however, the respondents reported a variety of different alloys containing silicon, including SilicoCalcium and SilicoCalciumBarium. Defendant's Memo at 42-43. Not only did Plaintiff Benxi fail to correctly identify its product combination, but it also failed to report the proportion of each element in each alloy. Id. Although Commerce is required to verify the information upon which it relied in making its final determination, the burden of creating an adequate record rests with Plaintiff Benxi. See Mannesmannrohren-Werke AG v. United States, 120 F. Supp. 2d 1075, 1085 (citing Chinsung Indus. Co. v. United States, 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989) ("If plaintiffs' argument were to prevail the result would be to . . . shift the burden of creating an adequate record from respondents to Commerce.")). When "necessary information is not available on the record . . . the administering authority and

29

the Commission shall . . . use the facts otherwise available in reaching the applicable determination under this title." 19 U.S.C. § 1677e(a) (1999).

Here, Commerce could not assume that Plaintiff Benxi's product combination was the same as Plaintiff Anshan's because there were numerous Silicon product combinations on the record and Plaintiff Benxi, unlike Plaintiff Anshan, failed to identify the relative percentage of each element in each alloy. Accordingly, Commerce's decision to assign an equal percentage to each element reported by Plaintiff Benxi was a reasonable decision based on the facts otherwise available in the record.

**7.**

**Commerce's Refusal to Adjust Plaintiff Baosteel's Factors of Production for Defective Hot-Rolled Sheets Is Not In Accordance With Law**

Plaintiff Baosteel claims that Commerce should have adjusted Baosteel's factors of production to reflect its decision to treat Baosteel's defective hot-rolled sheets as non-prime merchandise under investigation sold in the home market.[16] Baosteel Brief at 46. Plaintiff

---

[16] In its factors of production calculations, Commerce's practice is to make negative adjustments to normal value in order to account for sale revenue of by-products generated during the production process. See Notice of Final Determination of Sales at Less Than Fair Value: Bulk Aspirin From the People's Republic of China, 65 Fed. Reg. 33,805, 33,807 (May 25, 2000) and the accompanying Issues and Decision Memorandum for the Final Determination in the Antidumping Investigation of Bulk Aspirin from the People's Republic of China (May 17, 2000) at Comment 13; see also Sebacic Acid From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, 65 Fed. Reg. 18,968, 18,971 (April 10, 2000); Certain Cut-to-Length Carbon Steel Plate From Romania: Preliminary Results of Antidumping Duty Administrative Review, 64 Fed. Reg. 48,581, 48,583 (Sept. 7, 1999). In the present case, Commerce rejected Baosteel's by-product claim for defective hot-rolled sheet and instead treated it as non-prime merchandise under investigation sold in the home market. Memorandum from Carrie Blozy through James Doyle to The File re: Analysis for the Final Determination of

Baosteel maintains it had "originally calculated its factors of production by dividing the amount of materials, labor, and energy consumed in the production of merchandise under investigation and other subsidiary products (**including** defective sheet) by the amount of merchandise under investigation produced during the POI (**excluding** defective sheet)." Id. at 47. According to Baosteel, "Commerce should have adjusted Baosteel's reported factors by adding the total amount of non-prime hot-rolled sheet produced during the POI to the total amount of merchandise under investigation produced." Id.

Defendant claims Plaintiff Baosteel "neglected to report the amount of subject merchandise subject to review" and "failed to exhaust its administrative remedies with respect to adjustment of the amount of merchandise under investigation . . . by not raising this issue until its Rule 56.2 brief." Defendant's Memo at 46. Contrary to Defendant's assertions, however, Plaintiff Baosteel did raise the issue in its case brief to Commerce during the investigation. See Brief of Shanghai Baosteel Group Corporation, Baoshan Iron and Steel Co., Ltd, and Baosteel Group International Trade Corporation (July 27, 2001) at 27-29, PR Doc. No. 212; Appendix of Public Documents in Support of Defendant's Opposition to Plaintiffs' Motions for Judgment Upon the Agency Record ("Def. App.") at 3. Plaintiff Baosteel also provided sufficient information in its questionnaire responses for Commerce to correctly identify the subject merchandise and the defective merchandise produced during the period of investigation. See Baosteel's February 26, 2002 Section D response, PR Doc. No. 125 at Exhibits 2-10.

Although Commerce's decision not to treat the defective hot-rolled sheet as a byproduct

Certain Hot-Rolled Carbon Steel Flat Products from the People's Republic of China: Shanghai Baosteel Group Corporation ("Baosteel Group"), PR Doc. No. 347 at 3.

was an exercise of its discretion, it should have reflected this decision in Plaintiff Baosteel's factors of production calculations by including defective sheets as merchandise under investigation. Accordingly, a remand is necessary so that Commerce may correct this ministerial error.

**8.**

**Commerce's Inclusion of All Baosteel Subsidiaries in its Normal Value Calculations is Supported by Substantial Evidence and Otherwise in Accordance With Law**

Plaintiff Baosteel claims that Commerce erroneously included the factors of production of producers in the Baosteel Group that did not sell merchandise to the United States during the POI in its normal value calculations. Baosteel Memo at 47. According to Baosteel, some of the producer in the Baosteel Group sold the subject merchandise to the United States during the POI, while others did not. Id. Plaintiff Baosteel claims that, for purposes of normal value calculations, Commerce should "recalculate [the] weighted-average normal values for Baosteel based on the factors of production only for those producers within the Baosteel Group that sold subject merchandise in, or to, the United States during the POI." Id. at 49.

Plaintiff Baosteel, however, misconstrues the scope of the antidumping statute. The term "subject merchandise" refers to "the class or kind of merchandise that is within the scope of the investigation . . .". 19 U.S.C. § 1677(25)(1999). In the present case, the scope of the investigation encompasses certain hot-rolled carbon steel flat products from the People's Republic of China. Final Determination, 66 Fed. Reg. 49,633, 49,634. No language within the statute supports Plaintiff Baosteel's proposition that non-exporting subsidiaries that

32

manufactured the subject merchandise during the POI should be excluded.  In fact, Commerce's

questionnaire, consistent with its practice, clearly states:

> If you produce the subject merchandise at more than one facility, you must report
> the factor use at each location.  You must also report the output of the subject
> merchandise at the various facilities during the POI.[17]

U.S. Department of Commerce Antidumping Duty Investigation Questionnaire, Case No. A-570-

865 (Jan. 4, 2001) at D-1, PR Doc. No. 39, Appendix to Memorandum of Defendant-Intervenors

Bethlehem Steel Corporation, National Steel Corporation, and United States Steel Corporation in

Response to Plaintiffs' Motions for Judgment on the Agency Record ("Bethlehem App.") at Doc.

14.  Furthermore, as Defendant and Defendant-Intervenors correctly point out, Plaintiffs'

preferred methodology would essentially facilitate manipulation of prices as "foreign producers

with multiple facilities would be able to move the production of U.S. sales to their most efficient

operations, thereby . . . understating normal value."  Bethlehem Brief at 49; see also Defendant's

Memo at 45.  Accordingly, Commerce's decision to include all of the producers in the Baosteel

Group was supported by substantial evidence and in accordance with law.

## V.

### Conclusion

For the foregoing reasons, the Court remands this case so that Commerce may: (a)

---

[17] US Department of Commerce Antidumping Duty Investigation Questionnaire, Case
No. A-570-865 at D-1 (Jan. 4, 2001), P.R. 39 (D-I App. Doc. 14).

reconsider its factors of production analysis by either providing an adequate explanation for its deviation from previous practice, or assigning surrogate values to Plaintiffs' factors of production for its self-produced intermediate inputs; and (b) adjust Plaintiff Baosteel's factors of production calculations in order to reflect Commerce's decision not to treat Baosteel's defective hot-rolled sheets as a byproduct.

_____
Evan J. Wallach, Judge

Dated:        July 16, 2003
              New York, New York

34